190 So.2d 368 (1966)
Fred O. DICKINSON, Jr., Comptroller of the State of Florida, Appellant,
v.
Roy N. GERACI and Pearl Geraci, Husband and Wife, R.R. Walden, As Tax Assessor of Hillsborough County, Florida, and Rudy Rodriguez, Ellsworth G. Simmons, Clarence Prevatt, Frank Neff and Elbert Moore, As the Board of County Commissioners of Hillsborough County, Florida, Appellees.
No. 7309.
District Court of Appeal of Florida. Second District.
September 30, 1966.
*369 H. Elmo Robinson, West Palm Beach, Warren M. Cason, John W. McWhirter, Jr., Tampa, for appellant.
C. Lawrence Stagg, of Knight, Jones, Whitaker & Germany, Tampa, for appellees, Roy N. Geraci and Pearl Geraci.
William Terrell Hodges, of Macfarlane, Ferguson, Allison, Kelly & Himes, Tampa, for appellee, R.R. Walden.
William G. O'Neill, Ocala, and Ervin, Pennington, Varn & Jacobs, Tallahassee, amicus curiae.
ALLEN, Chief Judge.
The plaintiffs below, Roy N. Geraci and Pearl Geraci, filed a complaint against R.R. Walden, as Tax Assessor, and other public officials of Hillsborough County, in which they alleged in part that they were the owners of substantial parcels of real property in Hillsborough County, one of said parcels being the homestead of the parties, and other parcels are used for citrus groves and are "agricultural" in character.
Plaintiffs alleged, in addition to their individual rights, that they were suing for the benefit of all other similarly situated owners of real property within the county.
Plaintiffs alleged an agreement the tax assessor had entered into with Hunnicutt & Associates, Inc., which is a corporation that performs property valuation and appraisal services under contracts; that the purpose of this reappraisal was to equalize the existing assessed values of property in Hillsborough County, thereby effecting a more equitable distribution of the tax burden, and that such reappraisal was presently being conducted; that the reappraisal will be completed prior to July 1, 1967, but it cannot be completed in time for use in preparing the 1966 tax rolls.
Plaintiffs further alleged in their complaint that the defendant Comptroller had ordered defendant Assessor to "factor" the real and tangible personal property tax rolls of Hillsborough County for the year 1966, and assigned a "tax factor" of 1.818 for Hillsborough County. "In compliance with the instructions of Defendant Comptroller, Defendant Assessor intends to multiply the the present assessed value assigned to each parcel of property reflected on the tax rolls of this county by the prescribed `factor'."
Plaintiffs allege that the Comptroller has required that this "factoring" be completed no later than September 15, 1966, unless an extension to November 1, 1966 is granted under specified circumstances; that the property owned by plaintiffs, and others similarly situated, cannot be fairly or properly assessed at fair market value by applying a fixed factor or multiplier to existing assessed values. The values of property which would be computed by use of such method would bear no just relation to the real value of the property being assessed and would result in substantial inequality in such valuation. Plaintiffs further allege this method would produce such arbitrary and discriminatory assessments that it would only serve to compound, exaggerate and multiply any inequalities and disparities which now prevail in the assessed value of properties listed upon the present Hillsborough County tax rolls.
The plaintiffs ask, among other things, for the following relief:
(1) That the use of an artificial factor to multiply the present assessments of property located in Hillsborough County is unlawful;
(2) That the only proper and just method for the accomplishment of a uniform and equal assessment is through a complete re-appraisal of such property, such as that presently being accomplished under the Hunnicutt contract;
*370 (3) That if the Hunnicutt appraisal will not be complete in time for use in preparing the 1966 tax rolls of Hillsborough County, that the 1966 tax rolls may be prepared in accordance with the procedure followed by defendant Assessor in prior years, without prejudice to the right of any individual taxpayer to contest the amount or validity of any particular assessment; that the Assessor be permanently restrained from the use of any fixed factor or the use of any similar artificial means to increase property assessments in Hillsborough County; and that the defendant Comptroller be permanently restrained and enjoined from compelling the use by defendant Assessor of any fixed factor to multiply existing assessed values of property located in Hillsborough County, and that the defendant Comptroller be mandatorily enjoined to accept and approve the 1966 Hillsborough County tax rolls (or the recapitulatory tables thereof) if prepared and submitted in accordance with the Court's decree.
The Tax Assessor answered and, in effect, admits all allegations complained of in plaintiffs' complaint, except insofar as they were explained or amplified in the defendant Assessor's Cross-Claim against the defendant, Fred O. Dickinson, Jr., as Comptroller of the State of Florida.
The Tax Assessor's Cross-Claim against the Comptroller alleged that prior to June 28, 1965, and during his years of service as Tax Assessor, he had endeavored to assess all property for ad valorem taxation at its "full cash value" as provided by statute; and in determining full cash value he followed and applied the 1948 decision of the Supreme Court of Florida in State ex rel. Kent Corporation v. Board of County Commissioners, 160 Fla. 900, 37 So.2d 252 (1948), in which the Court held that current sales prices were not controlling or determinative of assessed values, and that tax assessors should strive to fix assessments somewhere between past and present market values as the "full cash value" of property.
The Tax Assessor further alleged in his Cross-Claim that:
"Upon learning of the Supreme Court's decision in Walter vs. Schuler, this Defendant determined and decided that it would be necessary to re-appraise and revalue all the real and personal property in Hillsborough County to insure that past assessments, as annually updated and revised in the normal course of affairs, measured up or complied with the new `market value' requirement with regard to assessments; and in view of the vast amount of complex work necessitated by such an undertaking, there being over 200,000 separate entries on the real property tax roll alone, this Defendant immediately began negotiating with the professional mass appraisal firm of Hunnicutt & Associates, Inc., to render its assistance so that the work might be accomplished properly and at the earliest practicable time."
The Tax Assessor further alleged that on October 29, 1965, he entered into a written contract with Hunnicutt & Associates, Inc., to provide the necessary qualified personnel and other technical assistance to him for the purpose of reappraising all the real and personal property in Hillsborough County; that such mass reappraisal program was begun immediately and is being conducted with all possible dispatch, and will be completed prior to July 1, 1967, in time for use in preparing the 1967 tax rolls for Hillsborough County. Such program, however, he alleged, will not be completed in time for use in connection with the preparation of the 1966 tax rolls which have, in fact, already been prepared and completed. A copy of the Hunnicutt contract was attached to the Answer and Cross-Claim.
Judge Oliver Maxwell entered a pre-trial order August 24, 1966, in which he stated:
"That upon the pleadings of the several parties now on file, the issues of fact to be tried are as follows:
"(a) Whether the 1966 tax rolls as prepared by the Defendant R.R. Walden *371 assess all property, or classes of property, at the same percentage of `fair market value,' or if there are varying ratios of assessment in relation to `fair market value,' whether a factor or multiplier can be applied so as to produce uniform and equal tax rolls at 100% of `fair market value.'
"(b) Whether the mass re-appraisal program now being conducted by Hunnicutt & Associates, Inc., can be completed in sufficient time for use in connection with the 1966 tax rolls.
"(c) Whether there is any method, other than by `factoring' or by mass re-appraisal, whereby uniform and equal tax rolls can be prepared for 1966 with all property assessed at 100% of `fair market value.' "That each of the several parties have stipulated and agreed, and the Court finds, that any delay in the completion and equalization of the 1966 tax rolls which results, in turn, in a delay in the mailing of ad valorem tax bills until after December 31, 1966, will cause chaos and confusion among the thousands of property owners in Hillsborough County; the financial community at large; and in the fiscal affairs of the County and the several taxing agencies dependent upon the tax rolls for revenue."
Judge Maxwell, after hearing the testimony on the 25th day of August, 1966, entered his final decree in which he stated that the Tax Assessor Walden, for the year 1965 and for many years prior thereto, assessed Hillsborough County property at its just or "full cash value" as defined by the Supreme Court of Florida in State ex rel. Kent Corporation v. Board of County Commissioners, 160 Fla. 900, 37 So.2d 252 (1948), and in accordance with the Florida Tax Assessor's Manual (1959) prepared by the State Comptroller, pursuant to Florida Statute, § 192.31, F.S.A. Judge Maxwell's final decree then stated:
"* * * In so doing, and as suggested by such manual (pages 27-28), the said Tax Assessor left out or disregarded the `high point of inflation and the low point of depression' reflected in current as related to past sales prices, and in the case of improved property, he adhered to the admonition of the National Association of Assessing Officers as set forth in such manual: `[D]on't go over reproduction cost now even if this is much less than what the property recently sold for.'
"3. All of such tax rolls, or the recapitulatory tables with respect thereto for 1965 and prior years, were accepted and approved by the State Comptroller pursuant to law.
"4. On June 28, 1965, the Supreme Court of Florida rendered its decision and opinion in Walter vs. Schuler, 176 So.2d 81, in which the Court inferentially repudiated its aforesaid decision in 1948, and held that all assessments should be made at `fair market value' which the Court defined as the amount a willing buyer would pay a willing seller, neither acting under compulsion.
"5. Immediately after learning of the Supreme Court's decision in Walter vs. Schuler, supra, the Defendant Tax Assessor began negotiating with the professional mass appraisal firm of Hunnicutt & Associates, Inc., to obtain its assistance in re-appraising all the real and tangible personal property in Hillsborough County at its fair market value, and a written contract between such parties was entered into on October 29, 1965. An en masse re-appraisal program was begun even before the written contract was signed, has continued without interruption since that time, and the anticipated completion date is on or prior to July 1, 1967.
"* * *
"7. The assessed values thus assigned to the approximately 200,000 parcels or entries on the 1966 tax rolls are at varying ratios in relation to `fair market value' as defined in Walter vs. Schuler, supra, this resulting from the difference between the assessment approach or criteria followed *372 in prior years as described in paragraph 2 above, and the `fair market value' requirement of Walter vs. Schuler.
"8. In view of the varying ratios of assessments in relation to `fair market value' as between individual properties and classes of properties on the 1966 tax rolls as now prepared, it is manifestly impossible to apply any uniform multiplier or `factor' to the thousands of entries on the existing rolls in an effort to produce `fair market value' assessments because such procedure would merely compound and exaggerate the aforesaid variances.
"9. Neither is it feasible or possible to apply adjusted or different multipliers or `factors' to the assessments on different properties or classes of properties in view of the magnitude of the number of parcels assessed on the 1966 tax rolls (approximately 200,000), and the great diversity and complexity of the types of property in Hillsborough County. The amount of work required in this county to determine the correct, individual multiplier or factor to be applied to each assessment in order to produce `fair market value' would take many months and would amount, in the final analysis, to a complete re-appraisal such as that already in progress; and, further, factoring of the 1966 Hillsborough County tax rolls (whether by use of uniform or individually determined multipliers) would so delay the collection of revenue as to cause chaos and confusion in the fiscal affairs of the taxing agencies as well as property owners.
"10. In sum, the only feasible, lawful method whereby uniform and equal tax rolls can be prepared in Hillsborough County with all property assessed at `fair market value' is by complete and systematic re-appraisal of all real and personal property in the county. Such a re-appraisal program is now being conducted by the Tax Assessor and Hunnicutt & Associates, Inc., with all possible dispatch, but the same cannot be completed in time for use in connection with preparation or revision of the 1966 rolls within this calendar year."
Judge Maxwell then ordered and decreed that the Tax Assessor be mandatorily enjoined to continue, with all possible dispatch, the complete, systematic re-appraisal program which is now being conducted by Hunnicutt & Associates, so as to insure the completion of the same on or before July 1, 1967. He also ordered that beginning January 1, 1967, the Tax Assessor should file monthly reports with the court as to the progress of such re-appraisal program. He further required the County Commissioners of Hillsborough County to proceed as a Board of Equalization with respect to the 1966 tax rolls as already prepared and submitted by the Tax Assessor.
The final decree also stated:
"That in view of the allegations contained in paragraph 7 of the Defendant Comptroller's affirmative defense to the crossclaim of the Defendant Tax Assessor wherein the said Comptroller defers to the judgment of this Court, if affirmed on appeal, and agrees to accept a tax roll that fails to meet the text of Walter vs. Schuler if the Court finds that such rolls cannot be properly prepared during the current year and that there is no method to enforce a reasonable and expeditious reassessment without creating chaos and disrupting the efficient operation of government; and the Court having so found with respect to the 1966 Hillsborough County tax rolls, it appears unnecessary to mandatorily enjoin the said Comptroller to accept and approve the 1966 tax rolls as previously prepared."
The court below also enjoined the Assessor from using or applying a multiplier or `factor,' as suggested by the Comptroller, to existing assessed values in the preparation of the 1966 Hillsborough County tax rolls.
To state in simple language how a factor or multiplier would work, where there are valuation inequities existing between different *373 pieces of property in Hillsborough County, as testified to by the witnesses below, and as so found by the circuit judge, let us use this example:
Suppose taxpayer "A" owns a piece of property he had bought in 1965 for a price of $10,000, which was placed on the tax rolls of Hillsborough County by the Assessor at $5,000 assessed ratio. This means that the property purchased at $10,000, has a market value of $10,000 at the current time, and is placed on the tax rolls at $5,000, is assessed at 50% of its actual value. So by multiplying this assessed value by 2, the property would reach its 100% valuation.
Now, suppose another taxpayer "B" had purchased a piece of property in 1965 for $10,000 and his property was placed on the tax rolls at $10,000 assessed valuation. Thus, one taxpayer's property was assessed at $5,000 and the other taxpayer's property was assessed at $10,000, even though they both paid the same amount for their respective properties, and all parties being willing sellers and buyers.
In using a factor of 2, you would multiply "A's" assessment by 2, which would make an assessment of $10,000, and would multiply "B's" assessment by 2, which would give him an assessment of $20,000. Therefore, "A's" property had been improperly assessed at 50% of its value and multiplying that by a 2 factor would bring his value up to 100% assessed valuation, yet taxpayer "B", whose property was originally assessed properly at $10,000, or 100% assessed valuation, when multiplied by a 2 factor would give him an assessment of $20,000, or twice as much as it should be.
We have examined the testimony and find a clear variation in the tax rolls of Hillsborough County, as did the trial judge.
According to Mr. Howze, a former Tax Assessor himself and a long time expert on assessing properties, whose organization made a ratio take-off for the Railroad Assessing Board, and from which study was derived the 1.8 factor that theoretically was to be used to multiply the present tax item assessments to bring the present roll up to 100% assessment, this method would be impossible with the varied under and over assessments of the Hillsborough roll.
Mr. Howze, as a witness, testified that he was an engineer, appraiser, and President of Howze & Associates, Tampa, Florida; that he had been continuously in the en masse appraisal field for the last sixteen years; that his organization had either completed or had under way the reappraisal and mapping program for fifteen to twenty counties in Florida and Georgia; and that it was doing work similar to the Hunnicutt organization, which had been employed to assist in the reassessment of Hillsborough County. All parties admitted the qualifications of Mr. Howze as a tax assessment expert.
Mr. Howze stated that in 1963 he had made an examination of the Hillsborough County tax roll as a part of the work activities of his firm in conducting a ratio assessment study for the Railroad Assessment Board of the State of Florida. He testified that his firm made a study in each of the sixty-seven counties in the state, including Hillsborough; that in setting up the criteria which they would work, the assessments were made as of January 1st, therefore the sales transaction preceding the year of assessment or assessment date of January 1, 1963, was used; and that they made 850 samples to determine the assessment ratio for Hillsborough County.
On direct examination, Mr. Howze testified:
"Q. * * * On the basis of your study, did you form a conclusion as to the average median ratio in this county that the assessed value of unimproved property bore to the sales price of unimproved property on the basis of your study?
"A. Yes. The median ratio for the unimproved was 29.33 per cent.

*374 "Q. Now, did your study indicate that every piece of unimproved property you checked was on the tax roll that 29.33 per cent of the sales price or market value?
"A. No sir.
"Q. Was there any range in valuation there?
"A. Yes, there was.
"Q. Could you give me an idea of what that range was?
"A. The range on the unimproved was from 6.86 to 150.00 per cent.
"Q. So, on the basis of your samples, you found some pieces of property on the tax rolls as low as 6.86 of the sales price and others as great as a 150 per cent of the sales price?
"A. Yes.
"* * *
"Q. I want to ask you the same line of questions with regard to improved property in this county. Did you come up with a median ratio of assessed value to sales price or market value?
"A. Yes. The median ratio for the improved was 51.05 per cent.
"Q. Again, this doesn't mean every piece of property on the road is 51.05 per cent, is that correct?
"A. That's correct.
"Q. Can you give me an idea of the range of values you found there?
"A. Yes. The range of values on the improved was from 9.71 to 192.00 per cent.
"* * *
"Q. Did you come up with an over-all median figure for the county?
"A. Yes. The over-all median ratio for the county, for Hillsborough County was 49.81 per cent."
Further in the testimony Mr. Howze testified:
"Q. Mr. Howze, in your opinion, based upon your study of the 1963 tax roll, could a factor have been applied to that tax roll on an individual parcel basis so as to produce a uniform and equitable tax roll at a hundred per cent of the sale market value?
"A. In my opinion, a factor could not have been applied.
"Q. Now, I want to ask you a few other questions, Mr. Howze, and ask you to make an assumption here. I want you to assume that there has been no general reassessment or re-appraisal in this county since 1963; that the only changes which have occurred on the tax roll have been for new construction and certain limited re-evaluations on a spot basis in particular areas but no overall reappraisal. Do you follow me up to this point?
"A. Yes.
"Q. In your opinion, would the 1966 tax roll for Hillsborough County, prepared on this basis, carry all the properties in the county at a fair market value?
"A. No, sir, I don't believe it would.
"Q. In your opinion, would the individual parcels of property on the tax rolls each be carried at the same percentage of fair market value?
"A. No sir.
"Q. And, bearing in mind the fair market value, would a tax roll, prepared for this year on that basis, be uniform and equitable with regard to market value?
"A. I don't know that I quite understand that question.

*375 "Q. If they are not of the same percentage, then, in your opinion, would this year's tax roll, solely with regard to fair market value, be uniform and equitable to the individual parcels?
"A. No sir, based upon the assumption that 
"Q. (Interrupting) Right.
"A. That's correct.
"Q. And, again, using the same assumption, in your opinion, could a factor be applied to the individual parcels on the rolls so as to come up with a uniform and equitable roll at a hundred per cent of fair market value?
"A. No sir.
"Q. And, in your opinion, is there any way to use a factor on a uniform basis without first learning the fair market value of each piece of property today?
"A. No sir, we do not know of any way of using a factor."
Mr. Howze was questioned as to the amount of time it took his organization to come up with an assessment figure in Orange County. He stated it took from eighteen to twenty months and that he used about twenty-five men at that time. He also testified that none of the counties in the state he was appraising at that time compared in size and complexity to Hillsborough County, they were all smaller.
There was put into evidence as plaintiff's Exhibit #1 a tabulation of individual samples in Hillsborough County ranging from 6.86% of actual value up to 192.00% of actual value. In checking this exhibit, we note on the first page there appears some 53 samples ranging progressively from 6.86% to 23.53%; that on the second page a similar amount of samples range from 24.00% to 46.96%; that on page three the ratio ran from 48.00% to 150%; the next several pages ranging from 45% to 51%. Of approximately 150 samples, some 100 samples range from 51% to 55%; some 100 samples range from 55% through 57%; approximately 60 samples between 60% and 65%; 55 samples range from 65% to 91%; and 21 range from 91% to 192%.
Exhibit # 1 ends with an unimproved median ratio average of 29.33% and an improved median ratio average of 51.05%.
Mr. R.R. Walden, Hillsborough County Tax Assessor, was next used as a witness. The gist of Mr. Walden's testimony was to the effect that since 1948, when the Supreme Court had ruled in the Kent case in Broward County that the values for assessment purposes over the years should be made somewhere between the low of depression and the high of inflation, he had assessed property in Hillsborough County that way. See: State ex rel. Kent Corp. v. Board of County Commissioners of Broward County, 1948, 160 Fla. 900, 37 So.2d 252.
Mr. Walden further testified:
"Q. Now, Mr. Walden, I believe you have basically mentioned it already, but during these years, say from 1950 up to the present time, while you were in the Tax Assessor's office, what was the general method or criteria followed by the assessor in arriving at assessed values of real property?
"A. The general method or criteria was to assess all property at a fair and equal assessment under this Kent case, of which we have to do our utmost to weed out inflation and all types of property as we consider in this inflation to the best of our ability so that every person would be treated on an equal basis to meet the Kent case, as I referred to.

*376 "Q. All right, sir, let me hand you a paper back book or manual and ask if you can identify that?
"A. Yes, I can. It's a Florida Tax Assessor's Manual of the State of Florida, prepared by the State Comptroller, who was then Ray Green, and published in the year of 1959. This, actually, was authorized under Chapter 1, 93.31 of the Florida Statutes [F.S.A.]."
This manual was offered in evidence. Attention was also called to the fact that on page 26 of this manual the case of Kent v. Board of County Commissioners of Broward County, supra, was quoted at some length. Thereafter the following paragraph from the manual was read into the record:
"The valuation of property as assessed by the Tax Assessor's office of Broward County was upheld by this decision. A study of this case indicated that the Assessor had set a level of assessed value, which he evidently considered to be full cash value within the meaning of the statute, leaving out the high point of inflation and the low point of depression. In other words, the assessment level reflected logical, reasonable conclusions regarding value and its stability over a period of time."
Mr. Walden then testified that he followed the guide line as set out in the Tax Assessor's Manual in assessing the real property in his county. He then further testified as follows:
"Q. Well, are the individual parcels or properties, assessed on that 1966 tax roll, which you have completed, all assessed at a given or stable ratio in relation to the current sales prices or market values as is defined in the more recent Supreme Court case of `Walter versus Schuler' to your knowledge as Tax Assessor?
"A. No sir.
"Q. Are the individual parcels or properties within a given class, according to use, such as residential, commercial or agricultural, assessed at a given or stable ratio to your knowledge within the class in relation to current sales prices or market values as defined in the `Walter versus Schuler' case?
"A. No, I don't believe they would be.
"Q. When were the 1966 tax rolls completed, Mr. Walden?
"A. The latter part of July in 1966.
"Q. Now, the statute requires, I believe, that those rolls be completed in the first Monday of July of this year. Did you obtain an extension from the County Commissioners this year?
"A. Yes, I did, for three weeks.
"Q. Were the rolls completed within the period of that extension?
"A. Yes, they were.
"Q. Did you submit to the Comptroller your recapitulatory table with respect to the 1966 tax roll as you completed it in the latter part of July?
"A. Yes, I did.
"Q. Let me hand you this letter and ask if you can identify it?
"A. Yes.
"Q. What is that?
"A. This is a letter returning the recapitulation figures from the Comptroller's office."
Mr. Walden further testified concerning the case of Walter v. Schuler, Fla. 1965, 176 So.2d 81, as follows:
"Q. What  if anything  did you do upon becoming aware of the Court decision in that case?
"A. I immediately contacted Hunnicutt Associates in Pinellas County to have them audit and reappraise *377 Hillsborough County in order to meet the Walter versus Schuler decision of the Supreme Court."
The Tax Assessor was then asked if a contract had been entered into between himself and Hunnicut Associates. He replied "yes," and the contract was then introduced into evidence. He stated that he had determined that it would be necessary to have a complete reappraisal of all property in Hillsborough County.
Thereafter there was a discussion between the Court, the lawyers and Mr. Walden as to whether or not Hunnicutt and Associates could give a factor figure based upon their current information, and they could not do so. The statement was then made that the Comptroller's office said they would supply a factor for Hillsborough County if Hunnicutt was not able to do so. Subsequently, they received a factor figure from Mr. J.N. Aycock, Director of the Assessment Standard Division, showing 1.8 should be used to bring the 1966 tax roll up to 100% valuation.
We note from some of the briefs and testimony that the Comptroller's office used the ratio study made by Mr. Howze, which was something slightly less than 50% ratio, and added a sum sufficient to bring the Howze study up to 55%, thus by multiplying by 1.8 you would get the total assessment for Hillsborough.
The Tax Assessor subsequently testified that he was preparing the current 1966 tax rolls by multiplying each item by 1.8, as ordered by the State Comptroller. Mr. Walden was then asked:
"Q. Do you know of any method, as Tax Assessor, other than complete en-masse reappraisal, whereby uniform and equal fair market value rolls can be achieved in Hillsborough County in 1966?
"A. No sir.
"Q. In the event it is necessary to go forward with the multiplication or factoring of the 1966 tax rolls, when will you, as Tax Assessor, based upon your best judgment at the present time, be able to finish that work and submit the adjusted or factored tax roll to the Board of County Commissioners for equalization?
"A. It would be in the latter part of October.
"Q. Of this year?
"A. Of this year.
"* * *
"Q. Mr. Walden, again, based upon your knowledge and past experience as Tax Assessor of this county, and assuming delivery of adjusted or factored tax rolls to the Board of County Commissioners in the latter part of October of this year, when, or at what time, would the 1966 tax bills be actually mailed out to the taxpayers of this county?
"A. Probably in the early summer of 1967.
"Q. Can you explain that answer, why it would be that long?
"A. Yes. From past experience and knowledge of what has happened in the past, both here, in Hillsborough County, and in some of our other counties, if the Board of County Commissioners, as a Board of Equalization, received this tax roll in the latter part of October or the first part of November, and then had to sit as a Board of Equalization until they heard all of the complaints that would be before this Board, from the past experience here in Hillsborough County when we have had, sometimes, like maybe two or three hundred appear be-before the Board, that it would, sometimes, take us three and four weeks with that two or three hundred before the Board to complete *378 all of the work that they had to do on it; but from the knowledge of what has happened in some of the other counties, after a tax roll is factored or multiplied or doubled, or whatever you might want to say that was done to it, where they had in Dade County something in the neighborhood of seventy-five thousand complaints and in Duval, where they had a much less number but way up in the thousands, and the Board of Equalization heard the complaints as they came in or, which I understand everyone is entitled to, that, if we could set it up with some system that, if we could hear a person every two and a half minutes for eight days or eight hours, for five full days, that we  at the most, we could hear one thousand a week, and that would leave no time for the Board of County Commissioners, who have to sit as a Board of Equalization, to even operate their own business; and if we could just run into something like twenty or thirty thousand complaints before the Board of Equalization, it could run into months before we were ever able to hear them all out and review the properties and come up with a correct assessment on those people."
It is worth noting that after this statement by the Tax Assessor, Mr. Hodges, of counsel in the case, stated:
"In that connection, if the Court please, as a part of my case, I would like to refer the Court again to paragraph five of the pre-trial order, which reflects a stipulation and a finding by the Court, that any delay in the completion and equalization of 1966 tax rolls, which result in turn in a delay in the mailing of ad valorum tax bills until after December 31, 1966, will cause chaos and confusion among the thousands of property owners in Hillsborough County, in the financial community at large and in the physical affairs of the county and the several taxing agencies depending upon the tax roll for revenue."
Mr. Walden was again questioned as follows:
"Q. Would your testimony, up to this point, be equally applicable to the tangible personal property roll as it would be to the real property roll?
"A. I would say that, even more so to the tangible personal property tax roll.
"Q. Now, you said, referring to your testimony, that you could not equalize the roll and bring it up to a fair market value by applying any factor or multiplier in your opinion as Tax Assessor?
"A. Thats' right.
"Q. Why is that true with respect to the tangible personal property roll?
"A. The tangible personal property tax rolls  through the years, we have had to rely on the people that made returns to our office as to what they owned, plus that part of the property that we could discover with our own people. In fact, this is the first time that we have ever  if you will notice the contract clause, that is the first time that we have had the opportunity to make an actual inventory of the tangible personal property in Hillsborough County, of which Hunnicutt will do and will leave us with a record that is set up, that we can keep it up in that same category from that date on; but I would say that it could be easily much more unequal than even the real estate tax roll."
*379 On cross-examination Mr. Walden gave the following testimony:
"Q. And, also, that you concede that the individual parcels are not on there at the same percentage of fair market value that may be high or low, but it varies between individual parcels?
"A. That's right.
"Q. So, in your opinion, the factor or multiplier cannot be applied in any way so as to produce a uniform and equal tax roll at a hundred per cent of the market value?
"A. That's correct."
Judge Maxwell interrupted the witness Walden at one point in the testimony as follows:
"THE COURT: What I'm trying to get at, gentlemen  and maybe you can help me out  I don't like to participate in this law suit if I can avoid doing it, but I want to know  I've got to know, and that is one of the things that the pre-trial order says we are going to try. Mr. Walden has testified that he can't arrive at a fair market value as defined in Walter versus Schuler in time to prepare this present tax roll. Now, one of the things that we agreed to find, if there was an alternative method  he's already testified with respect to factoring each individual parcel. What I am asking, is there any other method that you know of, whereby in 1966 you can come up with a figure of 1.8 times the present total 1966 roll excepting by using a factor on each individual parcel?
"THE WITNESS: The only way is to use the same factor on all individual parcels of property, otherwise, we'll have to go out and list each parcel to see what it should be.
"THE COURT: You mean you would have to do what Hunnicutt is doing now?
"THE WITNESS: That is correct.
"THE COURT: Do you want to pursue that, gentlemen? That is an issue in this case and that is what I am going to have to rule on one way or the other."
Mr. Walden, in effect, stated that he would have to apply a different factor to almost each parcel of property in order to come up with a current roll by factoring, but the Hunnicutt job would be done years before he could complete the job with his present staff. Mr. Walden then further testified:
"Q. You don't have eight or ten different classifications to which you could apply a different factor based upon your knowledge of about what they are assessed at?
"A. No sir, no, I do not have.
"Q. And come up with an equalized uniform tax roll?
"A. That's right.
"Q. Your answer to that is no?
"A. No."
Mr. Warren Hunnicutt, Jr., testified that he was a real estate appraiser, which was followed by an agreement on the part of the attorneys that he was a qualified expert in his field, and in addition thereto-the original sheet of qualifications of Mr. Hunnicutt was filed in evidence. He testified that his firm, pursuant to a written contract with the Tax Assessor Walden, was reappraising property in Hillsborough County and that he anticipated the completion *380 of this work about the middle of 1967. He testified:
"Q. Is there any possibility that it will be completed before the end of this year?
"A. No sir.
"Q. How many men, or how many employees do you have working on this project?
"A. It varies, but as of today, we have a hundred thirteen.
"Q. This is a full staff, as far as you are concerned?
"A. It can probably be increased from that, slightly.
"Q. Well, let me ask you this: Do you find any way, by working harder or putting more people on and so forth, that it could be done before the end of this year?
"A. No sir."
Mr. Hunnicutt stated that his firm had reappraised, under contract with the County or Tax Assessor's office, some 22 counties in the state as well as in other states. He stated this included the County in which Atlanta is situated, Fulton County, Georgia. He was questioned as to the effect of inflation, deflation and other factors that go into valuing property. Thereafter, Mr. Hunnicutt testified as follows:
"Q. All right, sir, does the importance or significance of speculation vary in degree as between the different classes of property and, by classes of property, I mean according to its use, residential, commercial, industrial and so on?
"A. I think, definitely, it does vary.
"Q. In which class of property is that factor more important than in the others? How would you rank them, in others words, in terms of importance?
"A. Well, I would say that the less important was commercial properties. I'd rank within that category industrial properties  commercial and industrial. Next, I would probably say residential properties. Next, probably, platted lots and, last, the area in which most speculation is prevalent is in tracts of acreage.
"Q. Now, Mr. Hunnicutt, assuming the existence of a real property tax roll consisting of approximately two hundred thousand or more separate entries of parcels with varying ratios of assessments in relation to fair market value, do you have an opinion as to whether a uniform and equal tax roll, with all property assessed at full market value, can be achieved by applying a multiplier or factor to existing assessed values?
"A. I certainly do.
"Q. What is that opinion?
"A. It can't possibly be done.
"Q. All right, sir, assuming the same facts, that is, the existence of a real property tax roll, consisting of approximately two hundred thousand separate entries of parcels, with varying ratios of assessments in relation to fair market value, do you have an opinion as to whether there is any method other than by complete en-masse reappraisal, whereby a uniform and equal fair market value tax roll can be achieved?
"A. Yes.
"Q. What is your opinion?
"A. It can't be done.

*381 "* * *
"Q. Now, one other question while I have interrupted you: What sales for what years were posted on these maps in Hillsborough County?
"A. In order to adequately analyze all the trend of value in this county, we decided that it would be wise to post all sales that had occurred since 1961.
"Q. So, every sale that's been made in this county, reflected by a recorded instrument, has been picked up, or will be, and recorded on these land value maps?
"A. I would say the greater preponderance of them, yes.
"Q. Go right ahead.
"A. While they are in the field, and I might say where it is accessible, every piece of land in the county is inspected visually. They notice any for sale signs. These land appraisers talk to other appraisers who have worked in the area, to real estate brokers who have either bought or sold or acted as agents for the selling of land in this area, and usually post all of these opinions of the various people right to this land value map. They also notice any special features of the land, such as a borrow pit or a deep hole or ditch running in front, things such as that. After all of this data has been collected and analyzed, they arrive at what, in their opinion, is a fair value for every parcel of land in the county."
Mr. Hunnicutt proceeded, through several pages of testimony, to set up the various criteria that was used by the different men he employs in getting up the data for each particular piece of property. He then further testified:
"Q. All right, sir, thank you. Have a seat. In undertaking this work, Mr. Hunnicutt, does any part of your function require an analysis of existing assessed values?
"A. No sir.
"Q. Do you study the existing assessed values? Have you studied them in Hillsborough County?
"A. No sir.
"Q. You proceed completely independently of what any assessments have been in the past?
"A. Yes.
"Q. Now, from the standpoint of complexity of the work, Mr. Hunnicutt, what is your opinion as to the magnitude of the work, the complexity of this county, from the standpoint of en-masse appraisal in relation to some of the other urban counties, which you, in your experience, have reappraised?
"A. Well, I think the best comparables that you can use  our firm was fortunate enough to appraise Atlanta and Fulton county.
"Q. That's in Georgia?
"A. Yes  in 1952, '53, '54 and, I believe '55. It took us three years to conduct a survey. At that time Atlanta had approximately two hundred twenty-five thousand parcels; Hillsborough County, today, has approximately two hundred thousand parcels. In Atlanta we did no appraisal of personal property. Here, in Hillsborough County, we are appraising personal property. So, I would say all things are considered. The two counties are just about comparable.
"Q. But, as I understand you, you say it took you three years there, whereas, it is taking you, if you finish, as you have indicated, about eighteen to twenty months here?
"A. Yes.

*382 "Q. How is it that you are able to do Hillsborough County faster than you did Fulton County or Atlanta?
"A. Because of the good statistical data that there is in Hillsborough County. There was no such data in Fulton County.
"Q. You are referring to Mr. Walden's existing records?
"A. That's correct. His property record 
"Q. (Interrupting) His property record cards?
"A. Primarily, yes."
At this time there was placed in evidence the work flow chart of Hillsborough County, about which Mr. Hunnicutt had been testifying.
On re-direct examination, Mr. Hunnicutt further testified as follows:
"Q. Mr. Hunnicutt, your contract with Mr. Walden provides that you will pursue this work with all possible dispatch. Since you've gotten started, have you had, in your opinion, sufficient employees to pursue this work with all possible dispatch?
"A. Yes.
"Q. Then, in your opinion, barring unforeseen circumstances, you will be through with the 1967 tax roll?
"A. Yes.
"THE COURT: Do I understand by that, that would mean prior to July 1 of 1967?
"THE WITNESS: Judge, we are doing our best. We think that it will be completed prior to that date.
"* * *
"Q. Now, while your firm has been performing this work in some of the other counties, you mentioned you, personally, have been almost continuously in this county since last October, haven't you?
"A. Yes, with certain side trips. I spend as much time as I possibly can here.
"Q. How many people do you presently have working on your phase of this project; in other words, other than the Tax Assessor's full time employees?
"A. You mean working on Hillsborough County?
"Q. That's correct.
"A. 113.
"Q. Is that the peak number? Have you had more than that?
"A. We've had more and we probably will have more sometime in the future.
"Q. Is there any way to increase efficiency in your operation by increasing the number of people you have employed?
"A. No sir."
Mr. Elmo Robinson, a special counsel for the Comptroller's office, was called to testify. After a printed copy of an address by Mr. Dickinson, the Comptroller, to the county tax assessors had been introduced into evidence, the Court inquired of Mr. Robinson:
"THE COURT: One paragraph reads  it's on page nine  `In any county where an order of a court of competent jurisdiction authorized an assessment revaluation time limit inconsistent with this prescribed course of action, such decision or order would, by law, after successful appeal, be followed by this office.' Do I understand then, your office would not recognize  of course, if any of these counties or state agencies should appeal, of course it would act as a superceder to any order that I might enter. Is it *383 the intent of the Comptroller that whatever order a Circuit Court would enter will not be observed until the Supreme Court has reviewed  "
The witness Robinson interrupted by saying:
"No. Just an appeal to the District Court, a successful appeal."
Then the testimony continued as follows:
"Q. Let me ask this: Does that mean that, if the appeal time were to be run  without the notice of appeal having been filed, would the Comptroller then evade the Circuit Court's order, which would then become final, or would he feel that an appeal would be required?
"A. He would feel that an appeal would be required.
"Q. Let me ask one other thing: In the event a court issued an order finding a factor improper and enjoining the use of a factor by the tax assessors and, if such order were appealed and affirmed, in that event, would the Comptroller feel that he could then accept the recap table for this county as prepared and previously submitted by the local Tax Assessor?
"A. If that order gave a time limit in it.
"Q. Say next year?
"A. Yes, he would follow it."
During the oral argument before this Court we asked the attorney for the Comptroller if this Court affirmed the trial court, would the Comptroller still follow the decision of the circuit court below and it was stated that he would.
The circuit court below refused to enter any order against the Comptroller following the Comptroller's assurance that on affirmance by this Court, the orders of the circuit court would be followed, so no decree was rendered against the Comptroller.
This Court also had the same assurance by the Comptroller's attorneys in this case that upon affirmance of the circuit court's order, the Comptroller would follow that order.
Mr. John Aycock, presently Director of the Assessment Standard Division of the State Comptroller's office, testified he signed a letter to Mr. Walden in which he identified how he arrived at the 1.8 factor. He stated, in effect, that the Howze study showed a ratio or a level of 49.81 as a median average; that there was controversy over the sampling and in order to take care of the possibility of error a 5% was added to 49.81 average ratio, rounding it off to 55%.
On cross-examination Mr. Aycock testified as follows:
"Q. Mr. Aycock, on Tuesday, July the 19th, which is the date that appears on that letter, did you make a statement, in the presence of Mr. Walden and certain newspaper reporters, that, if the factor 1.8, is applied across the board, as it will be to each parcel, it will not be equitable?
"A. Off hand, I wouldn't recall. I mean, there were several newspaper reporters in there, and television reporters were there, and there was quite a bit of conversation. Actually, I don't recall the exact statement. Generally, I would say I probably did.
"Q. You probably did?
"A. Yes.
"Q. If such a factor were to be applied across the board, it would be inequitable, is that correct?
"A. Yes, if you just took that factor and multiplied times the value for each piece of property.

*384 "Q. In this county, it would not result in an equal roll?
"A. On the presumption that the property in that county was not on the same assessment level. You see, the sales ratio study merely established the predominance of a particular ratio.
"Q. It shows the range in that study anywhere from 6% up to a 190%?
"A. I would imagine so.
"* * *
"THE COURT: But, then, did you use any independent research of your own with respect to land values in Hillsborough County other than your conclusion that you got from the Howze Report in order to come up with your figure of 55%?
"THE WITNESS: No sir, other than the fact that that was  the 5% allowance was put in there for the possibility of speculative land values as being included in the sample.
"THE COURT: That's why your figure was fifty-five instead of the over-all median of 49.81?
"THE WITNESS: That's right.
"Q. How did you compute that additional 5%, Mr. Aycock?
"A. Well, it was more or less my opinion as to what the possibility of error could be from that amount of sampling.
"Q. Upon what was that opinion based, what facts?
"A. General knowledge.
"Q. Would it be safe to say that 5% was just an arbitrary adjustment to the 49.81 to allow for speculative land values?
"A. Well, I'd say it was not an arbitrary figure, but I suppose that you could say, in a certain sense, that it was, but it was for the purpose of allowing for the inclusion of speculative land values at the sampling."
Later the court had the following discussion with Mr. Aycock:
"THE COURT: Well, then, how do you conclude that he could possibly do that in the light of the decision in the Schuler case when Mr. Howze' Report, on which you were partially relying had a range from 6.86% to 150% on unimproved property and 9.71% to a 192% on improved? How could he possibly do that without coming to exactly what they said in the Schuler case, by just multiplying the equities (sic) which already exist?
"THE WITNESS: I'm sure that, on any such program as this, Your Honor, there is actually going to be the same possibility of errors as there is in a day to day preparation of the roll. There is no perfect tax roll.
"THE COURT: I know, but you are familiar with, aren't you, with the Walter versus Schuler decision?
"THE WITNESS: Yes.
"THE COURT: I think it is the next to the last paragraph where  what is that 176  where they affirm Judge Durden in all respects except to  I believe one was the confusion that he permitted the Tax Assessor to be in and the other says, `We agree that revaluation and reassessment should immediately be accomplished and reinstated in the 1965 roll, from the imperfection of the roll for 1964, but we do not approve the suggestion of the Court that, as an alternative to a new roll, based upon revaluation and reassessment, the assessor might be in demand to simply double the assessment on the preceding roll. That percentage procedure would result in untold confusion and amount to multiplying the errors which plainly exist. *385 A hearing with reference to such procedures would be unavailable'
How could you justify him taking these different types  we'll just limit it to improved and unimproved  and use a different one  use one factor to the median when you have that greater range in percentage?
"THE WITNESS: Some forty counties have applied this procedure and come up with an estimate of values. Now, how the assessors did it, we left that entirely to them. That's their constitutional duty. We don't try to tell them, individually, what 
"THE COURT: (interrupting) On July 19, 1966, did you think that Mr. Walden, with an assistant of the Hunnicutt organization, could have reappraised each of these 191,000 parcels, between that time and November?
"THE WITNESS: No sir. That's why we put an adjustment ratio out.
"THE COURT: In order to get this straight, did you have any discussion with Mr. Walden about him applying a higher rate to unimproved lands?
"THE WITNESS: No sir, I had no discussion with Walden on that."
Tax assessments have been the occasion for numerous court actions in Florida. When the State levied taxes on property for State purposes, the people of County "A" who had their property valued at 60% of its actual value, would pay twice as much in taxes as would the people of County "B" whose Tax Assessor placed their property on the tax rolls at 30% of actual value, assuming that the total value of property in the two counties were equal.
We think we can take judicial notice that in the past most Tax Assessors knew the people of their county looked favorably on low ratios of assessment, and this would redound favorably in the Tax Assessors' election returns. Even today, where several counties are grouped for a joint undertaking, such as flood control, etc., different tax ratios could be, and are, unfair and discriminatory.
In the main, however, today it is the discriminate variations within the county that create difficulties and other factors that cause undue troubles for the Tax Assessor in fair taxation. For instance, our Constitution provides for $5,000 homestead exemption. It is well known in tax circles that homesteads have generally been placed on the exemption lists, even though they are several times $5,000 valuation. Agricultural properties are valued not at what a willing buyer and a willing seller, neither under compulsion, would place on a piece of property, but what its agricultural value would be.
In regard to the physical impossibility of a complete reassessment of Hillsborough County in time for use in preparing the 1966 tax rolls, we quote from the Supreme Court's opinion, written by Justice Thornal, in State ex rel. Glynn v. McNayr, Fla. 1961, 133 So.2d 312:
"We think also that within the area of discretion available to him in a mandamus proceeding, the trial judge properly denied the peremptory writ on the ground that the command of the requested writ, even if valid, would have been physically impossible of performance in time to produce the necessary tax income needed by the governmental agencies of Dade County during the current year. In other words, even if the remedy requested by the appellants could have been granted it would have disastrously affected the operations of the government, including the school system, because of the time that would have been required and the resultant delay in obtaining essential income.
"In arriving at the conclusion which we reach, we take note of the assurances of the respondent taxing officials to the effect that they contemplate immediately entering a program to achieve what they *386 describe as a fair and just tax roll based upon full cash value. They state that this will be accomplished not later than the 1963 roll. They give some indication that the work might be completed in time for the 1962 tax roll. While this contemplated program which is mentioned in the return, the testimony and in the briefs is not a determinative element in the decision which we reach, it does nevertheless indicate the good faith approach of the respondent officials in their effort to comply with the requirements of the Constitution and applicable statutes. It further evidences an absence of caprice in their action here under attack."
We hereinafter discuss two recent cases cited and discussed in the briefs and the testimony before the lower court.
In Walter v. Schuler, Fla. 1965, 176 So.2d 81, decided by the Supreme Court on May 21, 1965, it was held that "fair market value" and "just valuation" are legally synonymous and "fair market value" may be established by classic formula that it is the amount a purchaser willing but not obliged to buy, would pay to one willing but not obliged to sell. The Court also held that assessment at more or less than 100% did not accomplish "just valuation."
In addition, the Supreme Court held that re-evaluation and re-assessment was immediately to be accomplished to insulate the 1965 assessment roll from imperfections of the roll for 1964, but the Supreme Court would not approve suggestion of the circuit court that as an alternative to a new roll based upon re-evaluation and re-assessment the tax assessor might be mandated simply to double the assessments on the preceding roll where such procedure would result in untold confusion and would amount to multiplying errors which plainly existed and a hearing with reference to such procedure would be unavailing.
In its opinion, the Court said:
"The enormousness of circumvention of the command of the Constitution in the assessment of property in Duval County is plain from the figures in the final decree. There were more than 96,000 homestead exemptions in 1964 and 51,000 of these were wholly exempt from taxation.
"* * *
"The allegations of the complaint were that property was deliberately, systematically and intentionally being assessed at an average of 41.64 per cent. The Assessor denies this and although the record discloses that he had embarked on a plan systematically to prepare a proper roll for 1966 avoiding, no doubt, the deficiencies in the 1964 roll, it does show that the deficiencies were to be projected into the roll for 1965 continuing a system he had inherited. We affirm the finding of the chancellor that the 1964 roll should be condemned and that the standards followed in preparing it were `improper, unfair, unjust, discriminatory' and arbitrary and, of course, it was high time for the chancellor to halt such procedure before the 1965 roll became infected.
"* * *
"We agree with the chancellor's view that Sec. 193.021 was not intended to give assessors an almost unbridled discretion in the performance of their duty to establish just valuation. Rather, we regard the Act as an attempt by the legislature to pin the assessors more firmly to the Constitutional mandate. The result of such a construction is not to deprive these officers completely of their discretion for there is bound to be some tolerance in the execution of their task as they receive, weigh and evaluate varying information on the subject from different sources they consider reliable, but this opinion is designed to put at rest the procedure of setting assessable values at a percentage of `X'. It is apodictic that a percentage of `X' cannot be computed without first establishing `X' and the assessors upon reaching the first figure are enjoined not to proceed to the second.

*387 "* * *
"If assessors will apply that test and in doing so observe the seven guideposts in Sec. 193.021, justness should be secured to the taxpayer and the tangle that has developed should be unraveled.
"We agree that re-evaluation and re-assessment should immediately be accomplished to insulate the 1965 roll from the imperfections of the roll for 1964, but we do not approve the suggestion of the court that as an alternative to a new roll based upon re-evaluation and re-assessment the Assessor might be mandated simply to double assessments on the preceding roll. That procedure would result in untold confusion and would amount to multiplying the errors which plainly exist. A hearing with reference to such procedure would be unavailing."
In Burns v. Butscher, Fla. 1966, 187 So.2d 594, the Supreme Court of Florida, in an opinion written by Mr. Justice Thomas on June 8, 1966, said:
"As late as 1965, in Walter v. Schuler, Fla., 176 So.2d 81, we held that assessments of less than 100% could not be tolerated and that `X' should be fixed by applying the classic formula for establishing fair market value, namely the amount a purchaser under no stress to buy a given piece of property would pay a non-necessitous seller.
"* * *
"The need for such procedure is manifest from the list of counties and respective assessments published by the Railroad Assessment Board for the year 1965 after it had caused a survey to be made. From this it appears that in eight counties assessments are made on the basis of 100 per cent. of valuation while the range is from that figure to 17.54 per cent. in a certain county. The eight counties deserve mention: Alachua, Baker, Bradford, Duval, Hendry, Orange, Palm Beach and Union. The rhetorical question emerges: How could it be said that an owner of property assessed at 17.54 per cent. of full cash value carries his share of the burden?
"* * *
"We now, for the special attention of the 59 assessors who seem not to have brought assessable values up to 100 per cent. repeat from the Walter decision language we thought was clear: `It is apodictic that a percentage of `X' [the true assessable value] cannot be computed without first establishing `X' and the assessors upon reaching the first figure are enjoined not to proceed to the second.'
"By way of enforcement of the provisions that require the establishment of assessable values at the uniform figure of 100 per cent. the Comptroller is authorized to institute suits to secure obedience by officials of duties devolving upon them in relation to the tax laws and observance of pertinent regulations promulgated by the Comptroller. Sec. 196.16, Florida Statutes, F.S.A.
"* * *
"We are aware of no infirmity in Sec. 192.31 or, for that matter, in the whole plan which obviously was designed to effectuate uniformity and equality in taxation amongst all the counties of the State. But it is not restricted to such widespread application. There are instances where lack of uniformity and inequality become glaring because focused upon a relatively small and concentrated area. Such an illustration is Central and Southern Florida Flood Control District composed of 18 counties. It requires little imagination to comprehend the mischief that would result there if the county tax assessors could fix the assessable values willy-nilly, say from 17.54 per cent. up. And we discover no encroachment upon the ultimate power of the circuit courts with reference to taxes and assessment which they may exercise under Sec. 6(3) of Article V of the Constitution."
Because of the gravity of this case, we have discussed the testimony of the principal witnesses in detail.
*388 We noted previously in this opinion a pre-trial order, which Judge Maxwell had entered. The summarization of the issues and the conclusions reached by Judge Maxwell are as follow:
(a) Whether the 1966 tax rolls of Hillsborough County assess all classes of property at the same percentage of fair market value.
Judge Maxwell held that they did not.
(b) Whether the mass re-appraisal program now being conducted by Hunnicutt & Associates could be completed in sufficient time for use in connection with the 1966 tax rolls.
Judge Maxwell held that they could not.
(c) Whether there is any method, other than factoring or by mass re-appraisal whereby uniform and equal tax rolls can be prepared for 1966 with all property assessed at 100% of fair market value.
Judge Maxwell held that there was not.
It is also noted that as a part of the pre-trial order that all of the parties to the litigation below stipulated and agreed, and the court so found, that any delay in the completion and equalization of the 1966 tax rolls which result, in turn, in a delay in the mailing of ad valorem tax bills until after December 31, 1966, "will cause chaos and confusion among the thousands of property owners in Hillsborough County; the financial community at large; and in the fiscal affairs of the county and the several taxing agencies dependent upon the tax rolls for revenue."
It is recognized that it is the duty and function of the trial court to determine questions of fact, which has been done in this case by the trial judge.
We find a multitude of testimony from which the trial judge could have reached the conclusions that he did, and, frankly, no testimony from which a different conclusion could have been lawfully reached.
Finding no error, we affirm the lower court.
Affirmed.
HOBSON, J., and LOVE, WILLIAM K., Associate Judge, concur.