PER CURIAM.
The appellant was plaintiff below, having instituted this law suit pursuant to § 196.01 Fla.Stat., F.S.A. to set aside the 1967 assessment of taxable personal property which is located in Dade County, Florida. The thrust of the plaintiff’s case at trial was that the tax assessor had unconstitutionally discriminated against it in that the valuation applied to its property was higher than that applied to the other taxpayers in Dade County. In an effort to prove the allegations of discrimination, the plaintiff utilized a unique study, infra, through which it maintained that other property in the county had been systematically assessed at substantially less than fair market value, whereas Southern Bell’s property had been assessed at 100% of the value shown on its books. The plaintiff further alleged that because it is a public utility company, and therefore restricted and regulated by the state of Florida through the Public Utilities Commission, it was required to abide by the accounting procedures prescribed for such regulated business. The plaintiff contended that, under such regulated accounting procedures, it was unable to take advantage of various accounting options which were available to unregulated taxpayers, and therefore, the tax assessment based upon the plaintiff’s “net book value” was, in actuality, substantially different from the “net book value” computed for an unregulated business.[1]
*138 Although the above argument, pertaining to the accounting procedures under which Southern Bell was regulated, is certainly pertinent to the case, the main thrust of the appellant’s contention, both at trial and on this appeal, is that the study it conducted to establish the average level of assessment in Dade County conclusively proved that it was assessed at a higher, and therefore discriminatory, rate than the other taxpayers of Dade County.
It is now necessary to delineate the specific methodology used by the telephone company in conducting the survey of the average tax assessment level which it contended was prevalent in Dade County for 1967. Initially, we are presented with an exemplary final judgment, authored by the trial judge, which thoroughly sets forth a summation of the evidence pertinent to his ultimate finding in favor of the county. Judge Williams set forth this contention of the appellant in the following words:
“ASSESSMENT LEVEL OF REAL PROPERTY
“The second contention of the Telephone Company concerns the general assessment of real property in Dade County for the year of 1967, and its relation to the assessment of the Telephone Company’s personal property assessment. The Company relies principally upon the results of three assessment-sales ratio studies.
“The study most relied upon by the Telephone Company and most discussed in the trial was one initiated by the Company, with supervision and interpretation by persons having some experience in this field. Very briefly, this study was made by taking samples of real estate sales in Dade County for the period commencing July 1, 1966, and ending June 30, 1967. Allegedly, the sales prices of these sales were compared with the assessments on these parcels of property. The study purportedly showed that the single best estimate of the assessment level for real estate in Dade County was 81.37% of actual sales price. An expert witness, qualified and experienced in assessment-sales ratio studies, testified that there was only one chance in 10,000 that any other scientifically valid study would produce a median ratio of assessments to sales prices higher than 82.51%. Another expert witness, an economist who specializes in taxation and public finance, testified that in his opinion the study demonstrated a systematic assessment of the level of between 80% and 85% of fair market value.
“The Telephone Company submitted as corroboratory evidence a similar a.ssessment-sales ratio study conducted and published by the United States Bureau of Census for the last six months of 1966. That study showed the level of assessment of residential property in Dade County to be 83.2% of fair market value. The Telephone Company concedes that this study was more limited than the Telephone Company’s study both as to the period covered and as to the class of real estate studied. There was also no opportunity to cross-examine as to actual mechanics performed in the study.
“A third study was caused to be made by the Telephone Company from records of the Keyes Company, a large Miami real estate firm. This study covered all of the sales of real estate which that company handled during the period from July 1, 1966, through June 30, 1967. This study purportedly disclosed the level of assessment of real estate in Dade County to be 82.01% of fair market value.
*139 “In spite of the fact that the Telephone Company’s personal property was admittedly assessed at full market value, the Telephone Company would be entitled to relief if it could, prove that the County systematically assessed real property at some lesser percentage of fair market value. Dade County v. Salter [Fla.] 194 So.2d 780 [587].
“CONCLUSIONS AS TO ASSESSMENT LEVEL OF REAL PROPERTY
“The Court was somewhat impressed by the testimony concerning the assessment sales ratio study made for the Telephone Company; however, as pointed out by the County, there are not only some serious doubts as to the mechanics of the study but considerable doubt as to the conclusions drawn from the results. First, as to the mechanics of the study, it was not thought practical or necessary to consider all sales of real property in Dade County made during the period of the study; therefore every seventh sale was initially considered. Out of these sales many sales were discarded because of something on the face of the record indicating that such sales might not be representative sales and might not reflect a true sale for value. Assuming that a random sales method is satisfactory to establish a level it would appear that the method in this study was satisfactory. It would also seem satisfactory to discard any sales that appeared on their faces to be not representative of market value. However, the method used in the study left many questions unanswered because of the fact that those making the study did not or could not inquire into the true circumstances of each sale which was finally considered and used in establishing a level. (1) It was assumed that the documentary stamps on deeds reflected the true consideration for the sale. (2) With the exception of those sales in which the last names of buyers and sellers were the same, no inquiry was made as to any of the sales to determine whether they were arms-length transactions. (3) No attempt was made to determine whether there was any special consideration connected, with any sale that should have been considered an intrinsic part of the consideration but which was not reflected in the documentary stamps affixed to the recorded instrument. (4) No attempt was made to ascertain whether personal property had in fact been included in any of the sales when there was no specific recitation or mention of personal property in the deed. (5) No attempt was made to divide the property into commercial and residential categories. (6) No attempt was made to exclude transactions from the useable category even though a purchase money mortgage had been given the seller by the buyer and even though purchase money mortgages were indicated. (7) All lands in Dade County were considered to be urban rather than agricultural land for the purpose of the study, even though the land might have had the benefit of agricultural assessments under the “Green Belt” statute.
“In order for the Telephone Company to prevail by the use of this study, it would be necessary to either assume or to prove, (a) that the documentary stamps affixed to each recorded instrument used in the study reflected the full market value on each parcel of real estate; (b) that the results of the study reflected that the level of assessment to sales ratio showed a systematic level in the neighborhood of 81.37%. In the opinion of the Court neither of these two necessary elements has been proved. As to the use of documentary stamps to show market value, it would be necessary to use inference upon inference. Under some circumstances the documentary stamps affixed to a recorded instrument may be competent evidence from which it may be inferred that they represent the true consideration for sale. To reach the result desired by the Telephone Company, it would then be necessary to again infer that the true consideration represents the true market value. This does not necessarily follow. The sale price of property does not even in itself con *140 clusively or even prima facia reflect true market value; it is a factor that may be considered in determining fair market value (and probably a very good factor) but according to the law it is only one of several factors prescribed by law.
“As to the effect of the results of the study, the Court for the moment, for the sake of argument, will assume that the sales used in the study truly reflected the fair market value of the property sold. Even if that were so, it would not be sufficient to provide relief to the Telephone Company. From the testimony and exhibits concerning the assessment sales ratio study by the Telephone Company, an expert witness concluded that the 'median’ or ‘average’ level of assessment on real property in Dade County for 1967 was 81.37% and was without a doubt no higher than 82.5%. From a chart made by the witness admitted in evidence as Plaintiff’s exhibit No. 17, the Telephone Company contends that there is shown a substantial concentration of ratio in the area of 80% or 85%. From the Court’s observation, it is true that there are somewhat more transactions shown between 80% and 85% than other brackets, but it is doubtful whether such is a showing of a substantial concentration. It would appear to the Court that such transactions constitute less than 12% of all transactions. The best that can be said is that if the study was scientifically accurate it would reflect that the average assessment-sales ratio is about 82.5%. The question is whether the Telephone Company is entitled to have its property assessed at ‘average’ assessment of all real property in Dade County. The Court thinks not. It would appear that this identical question has never been squarely resolved yet in Florida. Florida cases cited by the Telephone Company reflect that in those cases it was either admitted by the assessor or proved easily that the assessor had systematically assessed property deliberately at some level less than full market value. There was a period of time in Florida when it was common knowledge that it was the practice to assess property at less than 100% of its full value. The Supreme Court of Florida even took judicial notice of that fact in Henderson vs. Leatherman [120 Fla. 496], 163 So. 310. The Telephone Company relies heavily on the case of Dade County vs. Salter, supra. The Salter case does not decide the question of proof. The ruling in that case was that if the plaintiffs proved their complaint they would be entitled to relief. The complaint in that case alleged that the assessor systematically assessed all property in Dade County, including the plaintiffs, at less than full cash value; that said systematic assessment was aimed at valuing all property in Dade County, Florida, at 47.27% of its full cash value; that plaintiff’s property was assessed in excess of 87% of its full cash value and that the tax assessor’s action was systematic and not through inadvertence and error. Such does not seem to be the case here. It does not appear to the Court, even from the figures of the study sponsored by the Telephone Company, that there was either a deliberate or unintentional systematic assessment at any particular level less than full market value.
“The Telephone Company contends that the evidence shows a substantial number of sales at the bracket of 80% to 85% of the full market value. This would constitute about 12% of all sales. The same figures show that those assessments in excess of full market value constitute 13% of all sales. Those sales showing an assessment ratio between 85% and 100% of full market value also constitute a large number of transactions; as a matter of fact, by the Telephone Company’s own figures and study, 50% of all sales show an assessment-sales ratio in excess of the 81.37% figure which the Telephone Company contends is the systematic level of assessment. As already noted by the Court, there does not appear to be an appellate decision in Florida on this point. The Telephone Company has cited cases from other states; some of which would appear *141 to be favorable to the Company’s position and where it would appear that those courts might have accepted an ‘average’ assessment sales ratio as representing the level at which any objecting taxpayer would be entitled to have his property assessed. However, it is difficult from reading these cases just exactly what the evidence was upon which the courts based their rulings. One of those cases reflects some information which might be enlightening; that of the appeal of Massachusetts Mutual Life Insurance Co. [426 Pa. 566], 235 A.2d 790. In that case some type of assessment-sales ratio study was made over a period of time including the years 1958 through 1963. As in the case at issue here, an expert testified as to the average ratio shown for the years 1962 and 1963 but added some further testimony. His testimony was to the effect that for the years 1962 and 1963, the average ratio shown by his study were 43.44% and 43.4% respectively of the sales prices; however, he further testified that the study showed that the assessments tended in each year to ‘cluster’ around ratios of 42% to 46%. The reported case does not reflect just how si2eable this ‘cluster’ was. It would appear to the Court that if a truly scientifically conducted study were made of sales over a period of time, making sure that the true sales price of all arms-length transactions were determined, and that a really substantial number of transactions clustered around a portion of the percentage scale, such evidence might be of some determining value as to the true assessment level. In this case for instance, if a reasonably accurate study reflected that the large bulk of sales, such as 50% or more of the sales studied, fell within the 80% to 85% level, a court might reasonably find that there was indeed a systematic assessment level at 82.5% of full market value and that a taxpayer assessed at more than 85% of the full market value of his property would be entitled to relief. This might be true whether such assessment level had been reached by the assessor deliberately, or accidentally by reason of the procedure he was using.”

“FINDINGS
“1. The studies presented by the Telephone Company which attempt to establish a ratio between assessments and sales are unreliable indicators of the level of real property assessments in Dade County in 1967, and do not demonstrate with any reliability that the level of real property assessments was less than market value.”
We can find no fault with the trial judge’s assessment of the sales ratio study. To conduct a random survey of every seventh real estate transaction in Dade County for 1967, utilizing the documentary tax stamps as prima facie evidence as to the total value of all property conveyed thereby, did not, in our opinion, yield an accurate basis upon which to compare the tax assessment rate levied on all the aggregate properties for that year. Inherent fallibil-ities in such a method have been accurately delineated by the trial judge, supra, and we will not disturb his finding in this regard. Realistically speaking, to stamp with approval the contention of the tele-hone company as to the established rate of taxation in the county for that year would forever after place upon the assessor either the burden to overcome, or the obligation to conform to, any similar study based upon a random selection of property transactions in Dade County. Before we would consider placing the tax assessor in such a position, we would require firm and convincing proof of the efficacy and accuracy of such a study which would necessarily impose the standard norm for the assessment level in the county. The present study, conducted by the appellant, certainly does not contain that degree of accuracy. Under this study, i. e., the computation of the aggregate net value of all the total transactions being considered, to rely upon the documen *142 tary tax stamps as sole evidence of net value, would, in our opinion, yield misleading and inaccurate results. In its attempt to establish a uniform pattern of valuation to a group of random transactions, Southern Bell has attempted to use actual sale prices on a mass basis without ascertaining whether there was a logical relationship between the sales price and the actual values: whether the buyers and sellers were reasonably informed; whether the transaction was an arm’s length bargain; or whether there were special circumstances (e. g., inclusion of personalty; seller taking back a purchase money mortgage) involved in the transactions that might have rendered some or all of them unusable. In our opinion, the tax assessor’s own estimate of fair market value was as valid and reliable as the random study conducted by the appellant.
As its final point on appeal, Southern Bell contends that the circuit court erred in determining that it was required to pay interest at the penalty rate of 1% per month on the amount of the disputed tax. In view of the recently announced decision of the Florida Supreme Court in Adler-Built Industries, Inc. v. Metropolitan Dade County, Fla. 1970, 231 So.2d 197, opinion filed January 28, 1970, that portion of the final judgment pertaining to interest on the disputed tax is reversed, and the issue is remanded to the circuit court with directions to assess interest in compliance with the rule in Adler-Built Industries, Inc., supra.
The holding herein disposed of the appellant’s issues for review although each specific point on appeal is not dealt with as such. For the reasons stated, the final judgment' as it pertains to legality of the 1967 property assessment is hereby affirmed. That portion of the judgment setting interest is hereby reversed and remanded with directions.
Affirmed in part; reversed in part.

. Specifically, the telephone company is required by the Public Utilities Commission to maintain its books in accord with the Uniform System of Accounts, which system requires it to capitalize certain items, including their acquisition costs, whereas a non-regulated business would be able to charge such items, or portions thereof, to current operating expense.
We note in passing that the appellant, having been granted an exclusive business monopoly to provide an essential public service, is held to a more rigid standard of accounting practice than other businesses not so situated. Certainly, a primary reason for that standard is to provide the regulatory agencies with uniform and accurate accounts that those agencies *137 will utilize when they regulate the rates to he charged to the public by the utility company. Rate regulation, in this instance, is, by law, determined so that the utility company will receive an established rate of return on the actual capital it has invested, such being generally designated as the “rate base”. In other words, these companies are permitted to charge rates for the services which they — and they alone — provide to the public, that will produce a predetermined rate of return, or profit, on the capital invested. Thus, the greater the amount that a utility company capitalizes rather than writing off as an expense, the higher the “rate base” becomes upon which its profit may be earned. Therefore, in the interest of a higher profit return on the capital invested, the telephone company would normally seek to capitalize as many items and normal expenses as possible. Nevertheless, on this appeal, we are confronted with the telephone company's contention that it is entitled to special tax treatment because of the particular nature of its accounting procedures. At the trial level, the circuit judge refused to create such a dual standard for the telephone company. See infra.
Another factor which the telephone company contends resulted in a discriminatory assessment is the accounting regulation pertaining to depreciation. The plaintiff is required to utilize the “straight line depreciation method” in its books and records, whereas non-regulated taxpayers have the option of using several available forms of “accelerated depreciation”. Although the end result of these methods of depreciating personal property is theoretically the same, there is a possibility of wide divergence in the given value of a particular asset at any given time during its useful life. It was admitted by the tax assessor that, because of the form of the returns furnished by its comptroller’s office, he was unable to determine which taxpayers utilized straight line depreciation and which utilized accelerated depreciation. Within the final judgment, the trial court acknowledged the existence of this discrepancy, and took into account its legal significance in these words :
“This court is sympathetic, to some extent at least, with the telephone company’s complaint about the manner in which personal property is assessed. It would appear that a taxpayer who keeps fair and accurate accounts, whether forced to do so by regulations or not, is more likely to be assessed higher than taxpayers who keep inadequate or confusing accounts or who deliberately or accidentally violate rules set up by the assessor. This is not the result of any deliberate effort on the part of the assessor but because of the lack of means on the part of the assessor to check each return as carefully and deliberately as might be desired. However, the fact that an unfair assessment or assessment procedure is not deliberate on the part of the assessor is not a determining factor. If an inadequate assessment procedure results in discrimination against a taxpayer he is entitled to relief. On the other hand, a showing of a possibility or probability of discrimination of some uncertain degree is not sufficient to entitle the taxpayer to relief.
* St « * St
“It is the opinion of the Court that although the procedure implemented by the Assessor in computing the 1967 personal property assessments left something to be desired and that there were at least a few taxpayers who were not assessed at the full market value of their personal property; nevertheless, the Court is of the opinion that the Telephone Company has failed to prove that this was true of any substantial number of taxpayers and has failed to prove that tangible personal property in Dade County in 1967 was systematically assessed at substantially less than market value. Certainly no particular level of undervaluation was established.

“The Telephone Company failed to demonstrate that it was discriminated against when its 1967 tangible personal property assessment was compared to other tangible personal property assessments in the County in that year.
“(a) Although the Telephone Company would be discriminated against if personal property taxpayers were generally permitted to utilize methods of accelerated depreciation in calculating net book value and the Telephone Company was not, there was no showing or proof by the Telephone Company that any considerable number of personal property taxpayers was permitted to take advantage of accelerated depreciation for ad valorem tax purposes.
“(b) Differences in classifying certain expenditures as capital improvements or maintenance expenses for accounting purposes constitute an insufficient basis for *138 contending that assessments based on net book value are inherently discriminatory.
“(c) Assuming for the sake of argument that the Telephone Company has been generally discriminated against visa-vis other personal property taxpayers, there has been no showing of the specific extent of that discrimination and there is therefore no appropriate basis for relief.”