275 So.2d 4 (1973)
SOUTHERN BELL TELEPHONE AND TELEGRAPH COMPANY, a New York Corporation, Petitioner,
v.
COUNTY OF DADE, a Political Subdivision, et al., Respondents.
No. 39772.
Supreme Court of Florida.
January 10, 1973.
As Modified on Denial of Rehearing February 28, 1973.
John H. Wahl, Jr., of Walton, Lantaff, Schroeder, Carson & Wahl, Miami, William H. Adams, III of Mahoney, Hadlow, Chambers & Adams, Nathan H. Wilson, Jacksonville and John A. Boykin, Jr., Atlanta, Ga., for petitioner.
*5 Stuart Simon, Dade County Atty., and Robert A. Ginsburg, Asst. County Atty., for respondents.
Robert L. Shevin, Atty. Gen. and Winifred L. Wentworth, Asst. Atty. Gen., for the State of Florida; Rivers H. Buford, Jr., Charles E. Miner, Jr. and Gene T. Sellers, Counsel, State of Florida Board of Education, Tallahassee, for the State of Florida.
Benjamin K. Phipps, for the Tax Assessors Assn. of Florida, as amici curiae.
PER CURIAM.
By petition for certiorari, we have for review a decision of the District Court of Appeal, Third District (234 So.2d 135) on grounds of conflict with both prior decisions of this Court and different District Courts of Appeal of this State on the same points of law. Fla. Const., Art. V, § 4, F.S.A. Kelly v. Threlkeld, Fla.App. 1966, 193 So.2d 7. Florida Moss Products Co. v. City of Leesburg, (1927) 93 Fla. 656, 112 So. 572; Walter v. Schuler, Fla. 1965, 176 So.2d 81; City of Tampa v. Colgan, (1935) 121 Fla. 218, 163 So. 577; Burns v. Butscher, Fla. 1966, 187 So.2d 594; Dickinson v. Geraci, Fla.App. 1966, 190 So.2d 368; Camp Phosphate Co. v. Allen, (1919) 77 Fla. 341, 81 So. 503; Dade County v. Salter, Fla. 1967, 194 So.2d 587.
Petitioner sought relief from the 1967 assessment of its tangible personal property in Dade County, alleging that its property was assesesd at a substantially higher percentage of market value than that which the tax assessor had systematically assessed the property of other taxpayers. Petitioner contended that (1) although its property was assessed at full market value, the assessor had generally assessed real property at a ratio of approximately 80% of its market value, and (2) the assessor's systematic use of net book value to assess tangible personal property resulted in the personal property of other taxpayers being assessed at a level substantially lower than that of the petitioner's property.
Respondents admitted the petitioner's property had been assessed at its full market value thereby reducing the basic issue for trial to the proof and effect of other property in the county being assessed at a lower level.
In a very lengthy opinion detailing the testimony and exhibits received, the trial judge denied petitioner's requested relief. On appeal, the District Court quoted extensively from the judgment, added its own language and affirmed denial of relief. See Foley v. Weaver Drugs, Inc., Fla. 1965, 177 So.2d 221.
To prove the assessment level of real property in the county, petitioner introduced evidence of three assessment sales ratio studies.
First, assessment sales ratio studies were described by two expert witnesses, Weil and Ekeblad,[1] which established that an assessment sales ratio study is a scientific comparison of the assessments of properties with the sales prices of a statistically reliable sample of properties that are actually sold in the taxing jurisdiction. These experts confirmed that sales ratio studies give as objective measure of the level of assessment as can possibly be obtained, that they are widely used in other states, and that the generally accepted method of conducting them is outlined in a Guide for Assessment-Sales Ratio Studies published by the National Association of Tax Administrators. The sales used for their review, covering July 1, 1966, to June 30, 1967, were conducted under their instruction and supervision. The transactions (totaling 5,559) considered in this study were selected *6 by using a random sampling procedure (every seventh sale listed on the public records), wherein the sales price of each selected property was determined from the documentary stamps on the recorded deed. The amount of the assessment was determined from the tax roll. This information was noted on a separate card prepared for each transaction, together with a notation indicating whether the transaction fell into one or more of 23 special categories such as sheriff's sales, sales by fiduciaries and the like. Transactions which fell in these later categories were disqualified for consideration because it could not be assumed that they were arm's length transactions, thereby casting doubt on use of the sales price as evidence of the market value of the property transferred. Of the 5,550 transactions originally selected, 2,714 were thus disqualified.
The ratio of the assessment to the sales price for each of the 2,845 remaining transactions was then computed and noted on the card for that transaction. The cards were then arranged in ascending order of ratios, and the number of ratios in each range of five percentage points was recorded. The results were furnished to the expert witnesses who made the calculations determining the median level of assessment. They established that this study was conducted according to generally accepted principles for conducting sales ratio studies and specifically that it conformed in all significant respects to the procedure outlined in the Guide for Assessment Sales Ratio Studies.
The experts' actual experience in other states demonstrated that in such a study documentary stamps were reliable evidence of sales prices. Dr. Weil's studies disclosed that understamping was as prevalent as overstamping and that with the relatively large number of transactions utilized in sales ratio studies, any inaccuracies that creep in tend to offset one another with the result that studies based on documentary stamps are quite reliable.
Dr. Ekeblad, who made the statistical computations, demonstrated that in 1967 the best single estimate of the median level of assessment of all real properties was 81.37% of market value, with only 99 chances in 100 that the median level of assessment was no lower than 80.58% or higher than 82.17%.
Second, the next sales ratio study introduced by petitioner covered all Dade County sales transactions handled from July 1, 1966, to June 30, 1967, by the Keyes Company, one of the largest real estate firms in Florida. This study included only transactions in which a sales commission had been paid by one of the parties to Keyes. Therefore, there was no doubt that all of them involved actual sales price. Documentary stamps were not relied on to determine sales prices in this study. The prices were determined from the records of Keyes. As in the first study the tax roll was examined, the actual sales prices were compared with the assessments and a ratio of the sales price to the assessment of each property was computed. The resulting ratios were analyzed by the same process used in the Weil-Ekeblad study and disclosed a median assessment ratio of 82.01%. The similarity in the results of this study with those of the Weil-Ekeblad study supported the conclusions given by Weil and Ekeblad that a detailed investigation of each and every sale of record was unnecessary.
The third, and final study introduced was made by the U.S. Bureau of Census, which considered sales of non-farm residential properties for the last six months of 1966. This study disclosed a median ratio of 83.2%.
Even though the three studies used samples selected in different ways, they reached remarkably similar results, ranging from a low of 81.37% to a high of 83.2%, with a variation of only 1.83%.
To show that the tangible personal property of other taxpayers had been assessed at a substantially lower level than the level *7 at which petitioner's property was assessed, petitioner established (1) that the assessor had generally assessed personal property at its book value, (2) that under regulations of the Florida Public Service Commission and the Federal Communications Commission, petitioner is required to include in the cost of its property for accounting purposes certain items not generally capitalized by unregulated taxpayers, and (3) petitioner is required to use the straight line method of taking depreciation while other taxpayers may use various kinds of accelerated depreciation. On this point petitioner established that if other taxpayers were taking advantage of the accounting options available to them the book value of their property would range from 21% to 61% lower than the book value of similar property owned by petitioner. However, petitioner was unable to establish the extent to which other taxpayers actually were taking advantage of these options.
Respondents did not offer any evidence that sales ratio studies of the type introduced by petitioner are not a reliable and reasonable means of determining the assessment level in a taxing jurisdiction or that the studies introduced by petitioner had not been conducted according to generally accepted standards for conducting sales ratio studies, or that real property in the county was assessed at a level higher than the level disclosed by the studies. Instead, respondents opined that sales price is only one of the eight (formerly seven) factors which must be considered under Section 193.011 (formerly 193.021) Fla. Stat., F.S.A. in arriving at just valuation of property. They further opined that even if the price at which real property is sold is good evidence of its market value, that price may not be inferred from documentary stamps. They contended finally that the court should not accept a sales ratio study as reliable unless an investigation of each transaction is made to determine the sales price, whether the transaction was in fact at arm's length and, if so, whether the parties were fully informed when they agreed on the price.
Confronted with the foregoing, the Circuit Court denied relief, and the Third District Court of Appeal affirmed, holding that sales prices in the context of the studies introduced were not prima facie evidence of market value. Quoting in pertinent part from the judgment and opinion under review, we find these statements:
"In spite of the fact that the Telephone Company's personal property was admittedly assessed at full market value, the Telephone Company would be entitled to relief if it could prove that the County systematically assessed real property at some lesser percentage of fair market value ...
"... Assuming that a random sales method is satisfactory to establish a level it would appear that the method in this study was satisfactory ...
"... To reach the result desired by the Telephone Company, it would then be necessary to again infer that the true consideration represents the true market value. This does not necessarily follow. The sale price of property does not even in itself conclusively or even prima facia reflect true market value ..."
In Dade County v. Salter, Fla. 1966, 194 So.2d 587, we recognized that the constitutional rights of a taxpayer are infringed if his property is assessed at a percentage of value substantially higher than the percentage at which other property in the county is generally assessed even though his assessment is not above fair market value. Cf. Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340; Township of Hillsborough v. Cromwell, 326 U.S. 620, 66 S.Ct. 445, 90 L.Ed. 358. Since the tax base includes both real and personal property and the total base largely determines the millage rate, it makes no difference whether it is real or personal property that is undervalued. See Graham v. City of West Tampa, 1916, *8 71 Fla. 605, 71 So. 926; City of Tampa v. Colgan, 1933, 111 Fla. 538, 149 So. 587; Coombes v. City of Coral Gables, 1936, 124 Fla. 374, 168 So. 524.
The Salter case was decided on the pleadings. It held simply that the allegations of discrimination in the complaint stated a cause of action. It did not consider all the factual circumstances that may give a right to relief or how those facts must be proved. It did, however, establish one overriding principle: a taxpayer is entitled to a practical means of obtaining relief from discrimination. This case must be considered in light of that principle. In Salter, we held:
"... A taxpayer ... should not be precluded from relief because the sworn official has not performed the duty requiring him to assess all property at its full cash value. Nor does the granting of relief to these taxpayers in any respect affect or impair or be in any way inconsistent with the recent decisions of this Court holding that all real property in this State should be assessed at its full cash value.... The Supreme Court of the United States many years ago dealt with the identical problems in Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340, where Mr. Chief Justice Taft, speaking for the Court said:
"`... This Court holds that the right of the taxpayer whose property alone is taxed at 100 per cent of its true value is to have his assessment reduced to the percentage of that value at which others are taxed even though this is a departure from the requirement of statute. The conclusion is based on the principle that where it it impossible to secure both the standards of the true value, and the uniformity and equality required by law, the latter requirement is to be preferred as the just and ultimate purpose of the law.'
"The Court then observed that to deny relief to the taxpayer would uphold the violation of the Fourteenth Amendment to the injury of the taxpayer in that litigation... .
"To adhere to the opinion which has been filed would require these taxpayers, and other taxpayers who might find themselves in the same position in any of the sixty-seven counties in this State, to successfully institute and prosecute proceedings to require the assessor to raise all other properties in the county to the statutory valuation, a burden which in most instances would amount to depriving the taxpayer of any remedy whatever, in order to obtain relief. This question was also considered by the Supreme Court of the United States in Sioux City Bridge Co. v. Dakota County, supra, where Mr. Chief Justice Taft, again speaking for the Court, said:
"`... The conclusion in these and other federal authorities is that such a result as that reached by the Supreme Court of Nebraska is to deny the injured taxpayer any remedy at all because it is utterly impossible for him by any judicial proceeding to secure an increase in the assessment of the great mass of underassessed property in the taxing district.'"
The "just valuation" at which property must be assessed under the Constitution and Section 193.011 (formerly 193.021) Fla. Stat. is synonymous with fair market value, i.e., the amount a purchaser willing but not obliged to buy would pay to a seller who is willing but not obliged to sell. Walter v. Schuler, Fla. 1965, 176 So.2d 81. When no actual sale has occurred, Section 193.011 Fla. Stat., F.S.A. requires the assessor to place himself in the position of the parties to a hypothetical sale of the property, to consider all of the factors they would regard as important in fixing the price of the property and to arrive at an opinion of value.
*9 When a sale has actually occurred each party to the transaction has prima facie made his own appraisal of the individual property based on his needs, his ability to pay, the price at which like properties are offered and other relevant factors. Each party has backed up his appraisal by paying or receiving the price finally negotiated. In reaching an agreement the parties influence the price negotiations of later buyers and sellers of similar properties. Therefore, in this context the price at which property is sold as indicated by documentary stamps on the instrument is prima facie evidence of its value. See Fla. Stat., §§ 201.01 and 201.02, F.S.A.
In Kelly v. Threlkeld, supra, citing Florida Moss Products Co. v. City of Leesburg, supra, the Fourth District Court of Appeal held that documentary stamps can be prima facie evidence of consideration paid. The only distinction, without significance, is that Kelly involved a single transaction whereas the case sub judice involved multiple transactions.
In City of Tampa v. Colgan, supra, our Court stated, among other things:
"... If similar property is commonly bought and sold, the price which it brings is the best test of the value of the land under consideration and the assessors need look no further ..."
The Second District Court of Appeal in Osborn v. Yeager, Fla.App. 1963, 155 So.2d 742, quoted 31 Fla.Jur., § 265:
"... If similar property is commonly bought and sold, the price which it brings is the best test of value ..."
Of course, sale price is not conclusive evidence of value in every case. The sale may not have been at arm's length. The parties may not have been fully informed. One party may have taken unfair advantage of the other. A full investigation of every sale might well reveal that many took place under other than ideal conditions, and departures from the ideal exist in any market, even the stock market. However, unusual transactions do not prevent the market as a whole from being good evidence of value.
Sub judice it is clear that, although in a limited number of cases where factors may exist that detract from the reliability of an individual transaction as evidence, taken as a whole, sales prices are acceptable indicators of value. Certainly, when a large number of sales are considered, the factors which detract from the reliability of individual sales tend to offset one another, and the overall result is highly dependable. This is especially true when steps have been taken to eliminate transactions which appear on their face not to be at arm's length.
Sales ratio studies are intended to provide a statistically reliable method of relating assessments to sales prices. They have been recognized and accepted by the courts of our state, Burns v. Butscher, supra, and Dickinson v. Geraci, supra, as well as having been recognized by the courts of other states as a reliable means of determining an assessment level. See People ex rel. Wenzel v. Chicago & North Western Railway Company, 1963, 28 Ill.2d 205, 190 N.E.2d 780 and In re Appeals of Kents, 1961, 34 N.J. 21, 166 A.2d 763.
Whether a particular study has been properly designed and conducted is a question of fact to be determined in each case on the basis of evidence received. In this case the evidence as established by the judgment's findings was uncontradicted that at least the Weil-Ekeblad study was conducted according to generally accepted principles for conducting sales ratio studies. In holding that the studies were not reliable, the courts below substituted their own views for the undisputed evidence.
Although the sales ratio studies in this case revealed the median assessment level of real property to be approximately 82% they also disclosed that the property of other taxpayers had not been assessed at any particular uniform level. A graph of *10 the ratios reveals a bell-shaped curve with a few assessments at very low levels, the largest in the five percentage point range between 80% and 85%, and a few assessments at very high levels. The Courts below held that because the percentage range from 80% to 85% contained less than 50% of the ratios, petitioner was not entitled to relief. This holding runs contrary to the decisions of all the other courts that have considered this question. These decisions recognize that a taxpayer whose property is assessed at a level substantially higher than the average level of assessment suffers the same injury as he would suffer (1) if the property of every other taxpayer were assessed at a uniform level, and (2) if a taxpayer is denied relief either because other taxpayers are not treated uniformly or because they also suffer from discrimination, the assessor can make himself immune from suit by his discriminatory conduct. In re Appeals of Kents, 1961, 34 N.J. 21, 166 A.2d 763; In re Brooks Building, 1958, 391 Pa. 94, 137 A.2d 273; Deitch Co. v. Board of Property, etc., 1965, 417 Pa. 213, 209 A.2d 397; Grainger Bros. Co. v. County Board of Equalization, 1966, 180 Neb. 571, 144 N.W.2d 161.
The decisions below are also inconsistent with our admonition expressed in Camp Phosphate v. Allen, 1919, 77 Fla. 341, 81 So. 503.
There we recognized that the provisions of the Florida Constitution relating to ad valorem taxation are intended to "adjust the burden of taxation so that every taxpayer may be required to contribute no more and no less than his share of taxes in proportion to the value of his property." A taxpayer whose property is assessed at a level substantially higher than the average level is required to contribute substantially more than his proportionate share of the tax burden. Therefore, the fact that other taxpayers are not assessed at a uniform level or that a few of them are also discriminated against does not bar a taxpayer from obtaining relief.
The courts below, having held that petitioner was not entitled to any relief, did not have occasion to consider how relief should be measured. This question is admittedly complicated, i.e., determining petitioner's fair share of the tax burden based upon a calculation of the ad valorem taxes petitioner would have been required to pay if the tax roll had been at full value, considering the established level of real property assessment and considehing the level at which personal property had been assessed. Since the trial court did not consider or pass on this issue, the case should be remanded for an opportunity to do so.
For the reasons outlined above, the decision below is reversed and the cause remanded for further proceedings consistent herewith.
It is so ordered.
CARLTON, C.J., and ROBERTS, ADKINS and McCAIN, JJ., concur.
ERVIN, J., dissents.
ERVIN, Judge (dissenting):
I feel I would be remiss if I did not briefly discuss why I think the petition for rehearing should be granted. The County points out in its petition that the Court majority herein at the appellate level has factually used sales ratio statistics of real property transactions in Dade County as the basis for a factual finding concluding Southern Bell is entitled to assessment over-valuation relief, while Southern Bell's suit for relief is for alleged discriminatory overassessment of its tangible personal property above the assessment of the property of other Dade County taxpayers.
The County points out in its petition for rehearing that
"the record indicates ... that the County assessed tangible personal property in 1967 on the basis of its net book value, which was its original cost less depreciation... . Personalty valuations *11 which were based on net book values that began with original costs, rather than present day replacement costs, did not take increasing values produced by inflationary trends into account... ."
The majority opinion uses an improper yardstick to compare the alleged systematic assessment discrimination between Southern Bell's tangible personal property assessment and other Dade County taxpayers' tangible personal property assessments. It used sales ratio statistics of real estate transactions to factually determine there existed discrimination in tangible personal property tax assessments.
It is quite apparent the majority predicates its decision on F.S. Section 193.011, F.S.A., which has primary reference to real property assessments under Section 4, Article VII of the State Constitution, F.S.A. Tangible personal property valuation obviously does not include many of the eight factors of F.S. Section 193.011, F.S.A., therefore it follows sales ratio statistics of real estate transactions (market value) are inapplicable as a basis for comparison in order to determine if there was a systematic discrimination.
It is obvious that the majority decision with its patently incorrect criterion for determinig systematic discrimination plays havoc with Petitioner's admitted tax liability of $5,080,571.91, less the statutory discount. This disturbing result allows a basis for an even greater tax reduction than Southern Bell claimed in its complaint.
I fail to see any basis for conflict with the decisions of the trial court or District Court of Appeal. Those decisions represent findings of fact based upon evidentiary considerations. There is no departure by these lower courts from any rule of decisional law in the area of tax assessment. I think the majority has merely substituted its evidentiary findings for those of the lower tribunals in a conflict case.
I would have discharged the writ.
NOTES
[1] Dr. Rolf A. Weil, President of Roosevelt University and Dr. Frederick A. Ekeblad, Dean of the College of Business Administration at the University of Bridgeport, who were both conceded to be eminent authorities in property tax administration and statistics with considerable experience in conducting sales ratio studies.