## SEABOARD COASTLINE RAILROAD CO. v. DEPARTMENT OF REVENUE.

No. 76-2513.

Circuit Court, Leon County.

September 27, 1979.

DuBose Ausley of Ausley, McMullen, McGehee, Carothers & Proctor, Tallahassee, for the plaintiff.

174

Harry F. X. Purnell and Daniel Brown of the Attorney General of the State of Florida's Office, for the defendant.

CHARLES E. MINER, Jr., Circuit Judge.

*Final judgment:* This is an action by Seaboard Coastline Railroad Company ("Seaboard" hereafter) against the Department of Revenue of the state of Florida ("state" hereafter), challenging as excessive an ad valorem tax evaluation made by the state upon railroad operating property for the 1976 tax year.

Seaboard's claim is two-fold. First, it asserts that the valuation of its operating property for the 1976 tax year, as determined by the state is substantially in excess of the just value of such property. Secondly, Seaboard maintains that it has been systematically singled out for discriminatory tax treatment by virtue of its being assessed at 100 percent of fair market value while all or substantially all other taxpayers in the state are assessed at a lesser percentage of fair market value.

To make it whole, Seaboard proposes that this court must first reduce its 1976 assessment as being unlawfully excessive, and after having done so, must then further reduce the assessment to equalize it with the general level of assessment in Florida and throughout the counties in which Seaboard operates.

Before addressing the substantive issues before the court, it seems appropriate to speak to the legal boundaries, precedentally determined, which limit this court's encroachment into a process which at best can be characterized as an imprecise exercise in human imperfection. Since judges may not substitute their judgment for that of taxing officials whose business it is to ascertain values of property for taxation purposes, it follows that judicial inquiry is limited to a review of the legal validity of the acts of such officials. *Florida East Coast RailwayCo. v. Green,* 178 So.2d 355 (Fla. 1st DCA 1965).

Let it be noted also that taxing officials are bound to follow the essential requirements of the law, and if they should fail to do so, or if their valuations should be shown to be products of arbitrariness or caprice, the court's duty to fashion appropriate relief in the premises is assured. *Florida East Coast Railway v. Green,* supra; *Dickinson v. Seaboard Coastline Railroad Company,* 231 So. 2d 28 (Fla. 1st DCA 1970); *City of Bradenton v. Seaboard Coastline Railroad Company,* 100 Fla. 606, 130 So. 21 (Fla. 1930); *Powell v. Kelly,* 223 So. 2d 305 (Fla. 1969).

With regard to railroad assessments, the First District Court of Appeal identified a faint beacon to guide our passage through this sea of inexactitude when it observed in *Green,* supra, at page 359 —

"The ascertainment of the value of a railway system is not a matter of arithmetical calculation and is not governed by any fixed or definite rule. Facts of great variety and number, estimates that are exact and those that are approximation, forecasts based on probabilities and contingencies have bearing and properly may be taken into account to guide judgment in determining what is the money equivalent — the actual value — of the property."

The discretion of the trial bench is further advised in *Green* and in *Seaboard Airline R. Co. v.Gay*, 74 So. 2d 569 (Fla. 1954), that there is a presumption of correctness which must be ascribed to taxing officials in the carrying out of their public duties. Equally well-established in the law is the proposition that the courts may properly intrude into the tax valuation prerogative in instances where it be shown that the assessments were the result of intentional fraud or discrimination on the part of the assessing officer; where assessments are arbitrary and capricious and inequality is gross; in those instances where assessed valuation subtantially exceed fair market value; to correct mathematical calculations leading to excessive assessments; and to rectify failure of taxing officials to comply otherwise with essential requirements of law. *City of Bradenton*, supra; *Dade County v. Deauville Operating Corp.*, 156 So. 2d 31 (Fla. 3rd DCA 1953); *Seaboard Airline R. Co. v. Gay*, supra; *Florida East Coast Railway Co. v. Green*, supra; *Dickinson*, supra; *Tampa Coca Cola Bottling Co. v. Waldon*, 250 So. 2d 52 (Fla. 2nd DCA 1969).

In reviewing railroad value determinations, the uninitiated trial judge is immediately struck by the subjective nature of the valuation process. "Assessed value," as that term is understood by the undersigned, is the end product of judgment fed on facts, forecasts, probabilities, contingencies, estimates and approximations flavored with a large measure of discretion. "Fair market value," as commanded by law and defined in substance by the courts, contemplates an arm's length purchase price negotiated by a knowledgeable buyer and seller in an atmosphere free of pressures to purchase or sell. It is the standard by which the stewardship of assessing officers is measured. Valuations based upon judgment enlightened by supportable data are all the taxpayers can reasonably expect, and such valuations should rest undisturbed by judicial inclination or differing expert opinion. On the other hand, discretionary valuations erected on a foundation of surmise, conjecture and demonstrated improbability are inconsistent with "fair market value," hence illegal.

Judicial examination of any assessment necessarily involves inquiry into the methodology of the assessing official. Crucial to a

determination of the validity of challenged assessment is explication by the assessor of the bases for the valuation. Validity or invalidity of the assessment might well depend on the amount of information available to the assessor; the nature and quality of the data available; whether the data was reliable; how the data was used. An assessor's good faith use of reliable data in arriving at his value conclusion is to be comended. A manipulative methodology which seeks the highest possible level of assessment, without regard to fair market value is unlawful and thus to be condemned. *West Virginia Hotel Corp. v. W. C. Foster Co.*, 132 So.842 (Fla. 1931).

Against backdrop of judicial precedent and understanding, the court will deal with the two substantive issues developed in the pleadings and at trial, i.e., valuation and equalization.

# I

## *Valuation issue*

The parties here are in agreement that the proper method of assessing property of an interstate railroad is the so-called "unit method" by which the operating property of a railroad is valued as an operating unit, and an appropriate percentage of that value allotted to the assessing state. In the instant case it is agreed that of the Seaboard system, 28.56% of the value should be allotted to Florida.

For the 1976 tax year the state, acting through Mr. Franklin, its supervisor of railroad assessments since 1973, valued the Florida portion of the Seaboard operating system at $229,736,000. At trial and in support of his determination of value, Mr. Franklin testified that he considered three recognized basic appraisal approaches to the value, i.e., income approach, cost approach and stock/debt approach.[1] He further testified that in his view a capitalized income approach is the most reliable indicator of value under the unit method of railroad assessment.[2]

### (A) *The capitalized income approach to value.*

There are two essential elements to the capitalized income approach to value, (1) the income to be capitalized, and (2) the rate of capitalization. Dividing the capitalization rate into the income to be capitalized produces the assessed value. In the context of this case, evidence was adduced at trial that the Interstate Commerce Commission (which body regulates Seaboard) requires that certain information be submitted annually in what is termed an "R-1 Report."

---

1. Also known as the market approach.

2. All experts with prior experience in railroad valuation who testified at trial were of the same opinion.

.Among data required is the net railway operating income figure ("NROI" hereafter) for the year covered in the report. All experts who testified at trial save and except for Mr. Franklin considered the reported figure to be an accurate reflection of the railroad operating income of Seaboard.

Mr. Franklin rejected NROI, as reported to the ICC, preferring instead to project income forward by projecting gross revenues and gross expenditures. In his calculations he made certain expense deductions, based upon what he thought the expenses should be, rather than accepting historical operating expenses reflected in the R-1 form. Although Mr. Franklin had hard data available to assist him in projecting income to be capitalized, he opted instead to eschew such figures in favor of a method described by Seaboard's experts in adjectives ranging from "unique" to "fatally defective.".

Since uniqueness of methodology is not necessarily inconsistent with fair market value, the court inquired of Mr. John Green, a veteran appraiser of railroad properties under the unit method for both taxing authorities and railroads,[3] wherein he found Mr. Franklin's methodology to be unlawfully flawed. Mr. Green responded in substance that the Franklin method "created non-existent income" which, when capitalized, did not "meet criteria for determining fair market value." Mr. Green further testified that he was not aware of a single tax administrator or appraiser "anywhere in the world" who utilized Mr. Franklin's methodology.[4]

With regard to use by taxing officials of NROI, as reported to the ICC, Mr. Green testified that acceptance of such figures in projecting income to be capitalized is virtually universal among tax administrators unless distortion should appear which would justify going behind these figures.

In this case it is parenthetically noted that there was no testimony of any kind or character to suggest that Seaboard had manipulated figures to depress income or had otherwise misstated income or that the NROI figures reported to the ICC contained distortion

---

3. Mr. Green testified that he has conducted railroad appraisals in some 28 states and estimated that 60% of his work was done for railroads and 40% for taxing authorities.

4. This response was substantially echoed by all other experts who offered testimony on the subject.

which would render them unreliable as a basis for projecting income.[5]

For the year in question, Mr. Franklin projected an income for Seaboard of $73,000,000, which he capitalized at the rate of 9.1% to arrive at his unit value of Seaboard's operating property. Evidence admitted at trial revealed that this projected income greatly exceeded actual NROI earned by Seaboard in any of the ten preceding years. Indeed, it was greater by almost 115% than actual NROI earned in 1975. All things considered, the court is constrained to observe that the state's optimism vis-a-vis projected income for the 1976 tax year appears more speculative than realistic.

The second essential ingredient in the capitalized income approach to value is the establishment of the rate of capitalization, i.e., a rate of return which a prudent investor would require in return for a capital commitment. Otherwise stated, a capitalization rate is the rate of return that is required to service debt and pay equity investors the rate of return they require to invest in a given business. The rates of return required for debt service and equity investment are combined into an overall rate which is reflective of the perceived risk in different types of debt and equity investment. The rates of return required for different types of investment vary in proportion to the risk involved.

During the trial, three witnesses offered testimony as to their opinion of the capitalization rate which should have been utilized in arriving at an assessed value for Seaboard's operating property for the 1976 tax year. Mr. Franklin, the state's appraiser, pegged that rate at 9.1%. Doctor Schoenwald and Mr. Green, Seaboard's experts, set the rate at 12.50% and 11.2% respectively.

Essential to a consideration of the whys and wherefores undergirding each opinion is an understanding that the fair market value of railroad operating property arrived at by the capitalized income method cannot be established in vacuuo. Allowances must be made for the ebb and flow of railroad economic fortunes, which, because of their cyclical nature defy trending.[6] It is hardly a secret and the court takes judicial notice of the fact that the locomotive is becoming increasingly hard-pressed to compete with the airplane and the semi-trailer for the transportation dollar. The state's expert

---

5. Mr. Russell Tipton, a retired accounting partner in the nationally recognized accounting firm of Haskins & Sells, offered uncontradicted testimony that net railway operating income is accurately reflected on the R-1 forms submitted to the Interstate Commerce Commission.

6. The testimony of Messrs. Schoenwald and Green was most persuasive on this point.

appraisal witness, Mr. Davis, perhaps put the matter in sharpest prospective when he observed that railroad industry earnings in 1975 were the lowest "since the depression." In regard to Seaboard, he concluded —

> "There is a question in my mind of whether on December 31, 1975 you could have found a buyer *..at any price* of Seaboard Coast Line Railroad Company." (Emphasis added)

Also to be remembered in analyzing a capitalized income approach to establishing fair market value is that as the rate of capitalization goes up, value goes down, and vice versa. A relatively small change in either the capitalization rate or the income to be capitalized may have a profound effect on the value conclusion.

Uncontroverted testimony before the court established that in 1975 government securities were yielding 7.6% to investors, AA-rated equipment trust certificates yielded 8.7% and A-rated conditional sales agreements and mortgage bonds returned 10%. Notwithstanding that all witnesses agreed that railroads are risky investments, Mr. Franklin calculated a capitalization rate for the 1976 tax year almost a point less than investors could earn on a far less risky investment venture. While his reasons for arriving at this capitalization rate are not pellucidly clear, one gathers that it reflects in part the state's earnest contention that an investor purchasing a single share of railroad stock will insist on a higher return than an investor who purchases all the assets of a railroad. The state reasons that the owner of a single share will only be able to obtain his return out of income available to shareholders, while the investor-owner will be able to acquire his return both out of the depreciation to which he would fall heir and out of distributable income. This ability to double-dip, says the state, makes the purchase of a railroad more attractive to the investor at a lesser return from earnings. The state argues further that failure of Seaboard's experts to take this "factor" into account renders their rates of capitalization suspect and results in a substanial understatement of value.

The state's argument on this point finds no support in the record. However, even assuming that it has some theoretical validity, given the depressed state of the railroad industry during the period of time in question, it is doubtful at best that a prudent investor would have committed capital to a railroad at the rate of return divined by the state. Otherwise stated, the double-dip factor urged by the state as a predictor of investor behavior is not sufficiently refined to permit of a conclusion that reliable benchmarks in the marketplace should be ignored or discounted in establishing rates of return required by the risk investor.

### (B)  *Stock/debt or market approach to value*

This approach to ascertaining value is based on a theory that an operating property is worth its debt and equity combined. Of the three generally recognized valuation techniques, persausive testimony at trial revealed this valuation tool to be, at best, of limited reliability in unit method valuation. Seaboard's experts considered this approach to value but never found it to be particularly helpful in ascribing a fair market value to Seaboard's operating properties. Mr. Davis, the state expert, also used this appraisal technique but discarded it for the same reason.

### (C)  *Cost approach to value*

Based upon the evidence adduced at trial it seems clear that the historical costs of railroads are substantially in excess of their current values and that appraisers utilizing this appraisal technique must compute an "obsolescence factor" in endeavoring to convert historic costs to current market value. It is equally clear that the experts who testified gave this technique very litle if any, weight in reaching a final conclusion as to value.

Of the generally accepted appraisal techniques previously alluded to, the cost approach to value seems to the court to be the most subjective and unrealistic. Indeed, to underscore the unreliability of the cost approach, Mr. Franklin's adaptations on this theme produced a complicated model which is the algebraic equivalent of Mr. Franklin's capitalized income approach and will always produce an indication of value approximately that of his income approach.

### (D)  *Direct sales approach*

While the direct sales comparison approach to value is not a generally accepted indicator of value when assessing railroads under the unit method of assessment because such sales are rare and usually occur under conditions that disqualify them as arm's-length transactions, the state expert, Mr. Davis, gave the greatest weight to direct sales comparison in arriving at his conclusion of the value. This reliance put him at odds with the state's appraiser, Mr. Franklin, who concluded in substance that no concrete conclusions of value can be reached from a survey of past sales of railroad property. Although Mr. Davis testified that he "would not rely upon sales between related parties or corporations in real estate transactions." the two comparable sales he used in his appraisal of Seaboard were the sale of a controlled company to a parent company and the sale of a company to its employees. As did all other appraisers and experts who testified at trial, the court, too, rejects this appraisal technique in this case as inherently unreliable as an indicator of fair market value.

## Summary as to valuation

Because there is no readily ascertainable market for railroad operating property, actual market value is not available. Consequently, taxing officials must avail themselves of recognized techniques theoretically designed to provide indications of actual market value for ad valorem taxation purposes.

Under the Florida Constitution and applicable law railroad operating property must be assessed at 100% of its fair market value. Fair market value is generally defined as the value that a willing seller will accept and a willing buyer will pay for an asset. An appraisal technique which does not yield a reliable indication of fair market value may not be used as a basis for an ad valorem tax assessment in this state.

In this case the state's appraiser, Mr. Franklin, has valued the Florida portion of Seaboard's operating property at some $229,000,000 for the 1976 tax year. The state's expert, Mr. Davis, relying primarily on an evaluation technique the court finds to be wholly unreliable as an indicator of fair market value, pegs Seaboard's value at some 5% less than the state's appraiser. One of Seaboard's experts, Doctor Schoenwald, maintains that the state's appraiser has overstated Seaboard's value as an operating unit by 108%, and the other, Mr. Green, contends that Seaboard's value is about one-third less than that found by the state's appraiser.

This wide divergence of opinion concerning Seaboard's worth during the tax year in question dramatically underscores the subjective nature of the unit method assessment process and sounds a clarion call for the introduction into unit method value determination of greater objectivity which will necessarily result in a more reliable indication of fair market value for ad valorem tax purposes.

Annual litigation over railroad assessments is virtually as predictable as death and the rising of the sun. Such continuing litigation seems counterproductive in that it is costly, time-consuming and imposes an inordinate burden on the energy, intellects and attentions of assessor and assessee, alike.

In an endeavor to encourage some measure of stability and fairness in the unit method assessment process within the confines of the proofs introduced upon this trial, the court is impelled to conclusions that follow.

1. Of the most generally recognized appraisal techniques utilized in unit method value determination, the capitalized income approach presents the truest and most reliable picture of fair market value.

2. The market or stock-debt approach to value, the cost method and the direct sales comparison techniques as tools to be used in unit method assessments are of dubious reliability and, while they may be useful in other appraisal settings, should not be utilized in railroad assessments because they do not, individually or in combination, reflect fair market value.

3. Net railway operating income as reflected in the R-1 forms required to be submitted annually to the Interstate Commerce Commission is almost universally accepted by tax administrators as a point of departure in arriving at income to be capitalized under the capitalized income appraisal technique. Use of an average of net railway operating income for the preceding five years as a predictor of income has previously been approved by the courts of this state because such an exercise is reflective of the ebb and flow of railroad economic fortunes.

4. Clear and convincing evidence at trial demonstrated that Mr. Franklin's computation of income to be capitalized was derived by a method unique to all the world except Florida. It seems to bear little relationship to actuality and when divided by an unrealistic capitalization rate tends to produce a result which, if related to fair market value at all, is so only by chance or fortuitous circumstance.

5. In pegging his rate of capitalization at 9.1% for the 1976 tax year, Mr. Franklin did not take into account readily ascertainable indicators in the marketplace which were clearly suggestive of the rate of return then demanded by risk investors. His failure to heed these benchmarks resulted in a capitalization rate which falls below the lower limits of the range of reasonable probability. Recognizing that reasonable men may differ in their construction of capitalization rates, the evidence at trial justifies and the court herewith establishes the lower dimension of the range of reasonable probability at 10.5%. Stated differently, a rate of capitalization which falls below 10.5% for the 1976 tax year will not produce fair market value when divided into whatever income factor is used.

6. The most persuasive testimony at trial as to value was that of Mr. Green, a veteran of many years of unit method valuation of railroad operating properties for both railroads and taxing authorities. This conclusion should in no way be interpreted in deprecation of the obvious abilities of Dr. Schoenwald or Mr. Davis, the other experts who offered testimony as to value. Doctor Schoenwald is primarily a corporate valuator and investment analyst. This is his first foray into the arena of railroad valuation under the unit method. Mr. Davis, a distinguished real estate appraiser for 48 years, has some experience in unit method valua-

tion of pipelines and utilities but had never valued the operating property of a railroad until he was hired by the state in this and a related case.

In ascribing the value of $157,100,000 to Seaboard's Florida operating property, Mr. Green, for all practical purposes, relied entirely on the capitalized income approach to value as the most reliable indicator of fair market value. After arriving at his value figure, he capitalized that sum at a rate of 11.2%. Again, realizing that reasonable appraisers might well differ in their construction of rates of capitalization, the court is persuaded that it is appropriate in this case to use Mr. Green's income figure and the rate of capitalization herein established as being the lower dimension of the range of reasonable probability, that is, 10.5%. This computation produces a value of some $166,000,000 which the court finds to be most nearly reflective of the fair market value of Seaboard's operating property in Florida for the 1976 tax year.

In sum, it may well be that there exists in the indistinct outer reaches of the appraiser's art a yet undiscovered method of appraising railroad operating properties which will come closer to revealing fair market value. However, for so long as the capitalized income approach remains the most reliable indicator of value extant, it should be used to the exclusion of other appraisal techniques which are by all accounts heavily fraught with subjectivity and of little utility in reaching the mandate of fair market value.

## I I

### The equalization issue

Relying upon the Fourteenth Amendment to the United States Constitution, and Article I, Declaration of Rights, Section 2, of the Constitution of the State of Florida, Seaboard seeks further judicial relief from their 1976 ad valorem assessment on the ground that its railroad operating property has been "singled out" for systematic and intentional assessment at 100% of fair market value, resulting in constitutionally impermissible discrimination vis-a-vis all or substantially all other property taxpayers of Florida whose properties are generally assessed at only a percentage of fair market value.

In support of this contention, Seaboard offered voluminous documentary evidence and lengthly technical testimony devoted exclusively to the issue of equalization. This evidence included a major assessment sales-ratio study commissioned in part by Seaboard, as well as other studies performed by the state and by the United States Bureau of Census.

In view of the disposition of this issue made herein, the court will not dwell at length with the substance of the evidence pre-

sented. Suffice it to say that Seaboard's assertions as they relate to substantial and wide-ranging under-assessments by property appraisers in Florida's 67 counties are well found in the evidence adduced at trial. Indeed, the state offered no proof on the subject of regional and statewide under-assessment save and except for its attempt to cast doubt on the reliability of the studies conducted for Seaboard and introduced in support of its contentions.

Persuasive indeed was the testimony of Doctors Weil and Ekeblad who concluded after examining the voluminous data collected in a study designed and executed by them to test the level of under-assessment in 1976 in Florida that "there is only *one chance in one million* that the median level of assessment of all taxable properties in Florida exceeds 71% of fair market value."[7]

It is evidence of this type that leads Seaboard to conclude that it is victimized by a system which causes its operating property to be assessed at 100% of fair market value while countenancing the assessment of other properties at levels substantially lower than 100% of fair market value.

To be sure, Seaboard's argument is appealing from an equitable point of view. However, as this court analyzes existing Florida judicial precedent upon which Seaboard stakes its claim, it is apparent that, if relief is to be afforded, it must come from the legislative, rather than the judicial branch of government. Otherwise stated, Seaboard is not now legally entitled to have its assessed value for 1976 factored downward from 100% of fair market value to the median level of under-assessment that obtains in the individual counties within its operational system, regionally in the system itself or in the state as a whole.

As previously stated, by long-standing case law and statutory dictates, railroad operating property is assessed on the unit or central system of assessment. The value of the entire interstate railroad as an operating entity is arrived at by Mr. Franklin or at his direction, and the value of the Florida portion of the operating unit (28.56% of the total value) is thereafter apportioned among the various counties in which the railroad operates on a situs or mileage basis. It is upon this apportioned value that the taxing bodies of the several counties within the operational system levy taxes.

It must be remembered that while each county is a taxing unit, it is also an assessment district. In each county, property appraisers,

---

7. Doctors Weil and Ekeblad are nationally recognized authorities in the design and execution of sales assessment ratio studies. It was on the basis of another study conducted by them that the Supreme Court decided *Southern Bell Tel. & Tel. Co. v. Dade County*, 275 So. 2d 4 (Fla. 1973).

constitutional officers all, hold sway over assessment of all taxable property in the county save and except railroad operating companies. Mr. Franklin, as assessor of railroad properties for the state, is for all practical purposes Florida's 68th property appraiser and his district or domain includes the geographic area in which railroads operate. Within his sphere of influence, Mr. Franklin's assessments, like those of all other property appraisers, are clothed with the presumption of correctness and he labors under the same constitutional mandate to assess at full or fair market value, as do his fellow appraisers. He differs from them only in that he is not a constitutional officer and appraises only one class of property.

The Florida cases upon which Seaboard relies seem to the court to be clearly distinguishable from the case at bar. In *So. Bell Tel. & Tel. Co. v. County of Dade*, 275 So. 2d 4 (Fla. 1973), the Supreme Court was faced with the situation where an assessing officer did not contest the fact that plaintiff's tangible personalty was assessed at 100% of fair market value, but where evidence in the form of ratio studies reflected that all realty in the county was under-assessed. On the basis of this testimony, the court found an entitlement on the part of plaintiff to have its personalty reassessed downward to the median level of under-assessment which was found to be 82%.

In *So. Bell* plaintiff was complaining that the Dade County tax assessor, whose rseponsibility it was to assess *all* classes of property within the Dade County assessment district, had systematically and intentionally singled out its property for high assessment.

Hard on the heels of *So. Bell* came *District School Board of Lee County v. Askew*, 278 So. 2d 272 (Fla. 1973). The Supreme Court there determined that ratio studies mandated by statute and conducted by the Auditor General and upon which state educational dollars were to be allocated were insufficient to prove that assessors were intentionally under-assessing properties within their respective assessment districts. This case seems to reaffirm the principle that assessors must be given leeway of judgment in the inexact art of property appraising and that some degree of judgmental error will be permitted without resulting in actionable under-assessment. Again it is noted that *Askew* called into question the stewardship of individual assessing officers acting within the geographic limits of their several assessing districts.

In *Spooner v. Askew*, 345 So. 24 1055 (Fla. 1977) the Supreme Court addressed the question of whether the actions of an assessor in one assessment district can be judged by what another assessor in a different district has done or not done. The court concluded in pertinent part at page 1059 —

"A taxpayer in Florida who is taxed at or under 100% of fair market value has never had standing to complain of an allegedly lower assessment level applied to taxpayers in another taxing unit. Neither *Salter*[8] nor So. Bell. suggest otherwise. The problem in those cases, which the court found both cognizable and remediable, came about 'because the sworn official has not perfomed the duty requiring him to assess all property at its full cash value.' The taxpayers in this case complained because their sworn official performed his responsibility too well."

Again in 1978, the Supreme Court had the opportunity to revisit the matter of inter-district equalization in the case of *Straughan, et al. vs. G. A. C. Properties, Inc.*, 360 So. 2d 385 (Fla 1978). There, Justice England, speaking for a unanimous court, reiterated the central theme of *Spooner* when he concluded at page 386 —

"The *Spooner* and *Armstrong*[9] decisions quite clearly state that inter-county assessment uniformity is not required by the Constitution, and that variations even between adjacent counties are not a basis for lowering tax assessments which are neither greater than 100% of fair market value nor unequally or improperly determined in relation to other properties within the same county."

Stated as simply as the complexity of the issue will permit, this court is persuaded that the quality of Mr. Franklin's stewardship cannot be measured by the work product of sworn officials in other assessment districts. His assessments, or theirs, must rise or fall on merit rather than inter-district comparison. The relatively new procedures designed to promote statewide uniformity in assessments to which Justice England alluded in a footnote in *Straughn*, supra, have not yet seasoned to the point of "flawless harmony" and the prospects seem good that they never will.

By this judgment, Seaboard's assessment for 1976 has been adjusted downward to full or fair market value. To factor it further downward with a stroke of the judicial pen in the name of uniformity is to elevate a goal to the status of a compellable right.

Accordingly, for the reasons ascribed herein, it is ordered and adjudged as follows —

1.  To the extent that the assessment of Seaboard's operating property for the 1976 tax year exceeds $166,000,000, said amount is hereby stricken because it is excessive, unreasonable and arbitrary and does not reflect full or fair market value.
2.  Seaboard's equalization claim is hereby denied.

---

8. *Dade County v. Salter*, 194 So. 2d 587 (Fla. 1966).

9. *Armstrong v. State ex rel. Beaty*, 69 So. 2d 319 (Fla. 1954).