WALLACE, Judge.
Marlene L. Sloan was the trustee of a trust created under the will of Donald E. Hemphill. She appeals a final judgment requiring her to pay the trust the sum of $3,226,044.99[1] for an alleged breach of trust and for the payment of excessive trustee’s fees and attorney’s fees.[2] Because the final judgment is not supported by competent, substantial evidence, we reverse.
I. INTRODUCTION
The focus of this appeal is the sale by Ms. Sloan, in her capacity as trustee, of a trust asset known as the Keysville Road Grove. In February 2007, Ms. Sloan sold this property for $1.5 million. Then the purchaser (Greentree Investors Group, Inc.) flipped the property to a second buyer (Taipan Property VIII, LLC) for a purported purchase price of $4.5 million. The trial court held Ms. Sloan liable to the trust for the $3 million difference between the $4.5 million purportedly paid by Tai-pan and the $1.5 million for which Ms. Sloan sold the property to Greentree. The primary issue on appeal is whether Ms. Sloan breached her fiduciary duty by selling the property for $3 million less than the $4.5 million purportedly paid by Tai-pan.
*40 II. THE FACTS AND PROCEDURAL BACKGROUND
Donald E. Hemphill made a pour-over will that created and funded the Donald E. Hemphill Trust (the Trust). Initially, the beneficiaries of the Trust were Donald E. Hemphill’s mother (Ruby Hemphill) and his two children (Daniel Hemphill and Heidi Bell). Ruby Hemphill died on August 31, 2006. After Ruby’s death and upon Daniel Hemphill reaching the age of twenty-one, the Trust corpus was to be divided into two shares — seventy-five percent for Daniel Hemphill and twenty-five percent for Ms. Bell. The Trust provided further for payments of income to each beneficiary from his or her share of the Trust until each of them reached the age of twenty-five. When a beneficiary reached the age of twenty-five, his or her share of the Trust was to be distributed to the beneficiary.
The record does not contain information concerning the birth date of either Daniel Hemphill or Ms. Bell. However, at a hearing held on August 27, 2007, Ms. Bell testified that she was then thirty-two years old, and Ms. Sloan testified that Daniel Hemphill was approximately twenty-eight or thirty. Thus, at the time of the litigation in this case, Daniel Hemphill and Ms. Bell were entitled to the distribution of their respective shares in the Trust.
Donald E. Hemphill executed his will on May 8, 2000, and he died two days later. In June 2000, the probate court admitted the will to probate and appointed Ms. Sloan as personal representative of Donald E. Hemphill’s estate. During the probate proceedings, Ms. Bell objected to the final accounting and to the petition for discharge filed by Ms. Sloan and sought to remove Ms. Sloan as personal representative. The parties resolved this dispute in part by agreeing that the Keysville Road Grove would be listed for sale. An agreement with a real estate broker, which was attached to and incorporated into the settlement agreement, listed the Keysville Road Grove for sale at $1,225,000. In August 2004, the probate court entered an order approving the settlement agreement.
Ms. Sloan completed the administration of Donald E. Hemphill’s estate in November 2004, and she assumed her duties as trustee of the Trust. Later, Ms. Sloan retained a real estate attorney to represent her in connection with the sale of the Keysville Road Grove. On November 22, 2005, Ms. Sloan, as Trustee, entered into a contract with the Keysville Road 57 Land Trust for the sale of the Keysville Road Grove. The sales price was $1.5 million, which was $275,000 more than the amount for which the property had been listed. Ms. Bell had previously approved the sale of the property at the listing price.
Next, the Keysville Road 57 Land Trust assigned the contract to Greentree, and Ms. Sloan executed a new sales contract with Greentree. The terms of the new contract, including the sales price, were substantially similar to the terms of the original contract. The parties described the later contract as “a novation” of the earlier contract.
On December 19, 2006, Ms. Bell filed an action against Ms. Sloan, individually, and as trustee of the Donald E. Hemphill Trust. In her complaint, Ms. Bell alleged that Ms. Sloan had breached her fiduciary duty by (1) failing to provide an accounting for the Trust, (2) failing to provide the beneficiaries with information about the administration of the Trust, (3) wasting the assets of the Trust, and (4) failing to distribute the assets of the Trust to the beneficiaries in accordance with its terms. Later, Ms. Bell filed a motion requesting the removal of Ms. Sloan as trustee and the appointment of a successor trustee. Daniel Hemphill subsequently joined the action *41 against Ms. Sloan as a party plaintiff, and together, Daniel Hemphill and Ms. Bell are the Appellees in this appeal.
Meanwhile, the sale of the Keysville Road Grove proceeded to closing. On February 15, 2007, Ms. Sloan executed a warranty deed for the property. However, the grantee named in the recorded deed was Taipan — not Greentree, the buyer named in the substituted contract. And the warranty deed, which was recorded on February 26, 2007, showed that the documentary stamps paid in connection with the transaction were $31,500. The amount of the documentary stamps affixed to the deed is consistent with a sales price of $4.5 million, not the $1.5 million called for in the contract between the Trust and Green-tree.
In August 2008, the trial court granted the plaintiffs’ motion to file an amended complaint as well as a supplemental complaint. The amended complaint added allegations that Ms. Sloan (1) paid herself unreasonable trustee’s fees without prior court approval, (2) failed to provide Ms. Bell prior notice of the planned sale of the Keysville Road Grove, and (3) sold the Keysville Road Grove for $3 million less than it was worth. The supplemental complaint alleged that Ms. Sloan paid her attorney for defending the complaint against her without first obtaining court approval to make the payments. Meanwhile, Ms. Sloan filed a petition for an order authorizing payment of trustee’s fees and attorney’s fees.
In March 2009, the trial court held a final hearing on all of the pending claims. After the hearing, the trial court entered the final judgment against Ms. Sloan for $3,226,044.99. Three million dollars of the judgment amount represented the difference between the $4.5 million in consideration purportedly paid by the buyer for the property and the $1.5 million actually received and accounted for by Ms. Sloan in accordance with the contract.[3] The trial court also denied Ms. Sloan’s petition for attorney’s fees and trustee’s fees in its entirety. The balance of the amount of the judgment represented trustee’s fees and attorney’s fees that Ms. Sloan was required to repay to the Trust. Ms. Sloan filed a timely motion for rehearing based on newly discovered evidence, and the trial court denied her motion. This appeal followed.
III. THE ISSUES ON APPEAL
On appeal, Ms. Sloan challenges both the final judgment and the denial of her motion for rehearing. In her first issue, Ms. Sloan argues that the final judgment is not supported by competent, substantial evidence. The argument on the first issue may be divided into three parts. First, there is no competent, substantial evidence in the record to support the trial court’s finding that Ms. Sloan is liable to the Trust for the “lost” $3 million. Second, the trial court erred in ruling that Ms. Sloan was not due any fees at all for her extensive services as trustee. And finally, the trial court erred in requiring Ms. Sloan to repay to the Trust all of the attorney’s fees paid from the Trust before July 2007. In her second issue, Ms. Sloan argues that the trial court abused its discretion in denying her motion for rehearing based on newly discovered evidence.
We will discuss the issues related to the sale of the Keysville Road Grove first. Because we agree with Ms. Sloan that there is no evidence that she breached her *42 fiduciary duty to the Trust in connection with the sale of the Keysville Road Grove, we need not discuss the denial of her motion for rehearing directed to this issue. After our consideration of the issues related to the sale of the Keysville Road Grove, we will take up the separate questions concerning compensation for the trustee and her attorneys.
IV. THE INSUFFICIENCY OF THE EVIDENCE TO ESTABLISH A BREACH OF TRUST RELATED TO THE SALE OF THE KEYS-VILLE ROAD GROVE

A. Introduction

In the amended complaint, the Appellees alleged that “[t]he ultimate purchaser paid $4,500,000 for the property, but the trustee agreed to accept only $1,500,000. The remaining $8,000,000 went to middlemen.” At trial, they argued, as they do on appeal, that Ms. Sloan should be held accountable for the $8 million difference because the documentary stamps on the warranty deed prove that “the purchaser of the Keysville Property paid $4.5 million for the property.” Notably, Ms. Bell and Daniel Hemp-hill do not argue that Ms. Sloan actually received $4.5 million for the property. Alternatively, Ms. Bell and Daniel Hemphill argue that the documentary stamps affixed to the warranty deed are prima facie evidence of the value of the property; therefore, Ms. Sloan should be held accountable for selling the property for $3 million less than it was worth.
At the final hearing, Ms. Sloan was unable to explain the apparent discrepancy between the contract price for the property and the consideration purportedly paid by Taipan as reflected by the documentary stamps. Ms. Sloan testified that she did not know until she was told — long after the closing — that the amount of the documentary stamps on the warranty deed corresponded to a sales price of $4.5 million. According to Ms. Sloan, when she was informed of this fact she was “absolutely stunned.” Ms. Sloan also testified that she had never seen the recorded deed or a copy of it after the closing.[4] According to Ms. Sloan, her real estate attorney never informed her that the purchase price was anything other than $1.5 million.
Ms. Sloan also testified that the only indication of the market value of the Keys-ville Road Grove that she had prior to the closing was an appraisal of $455,000 at the time of Donald E. Hemphill’s death and another appraisal prepared three months before the closing, indicating an appraised value of $625,000. And of course, Ms. Bell had approved the sale of the property at $1,225,000 one year earlier. Finally, it was undisputed that the check Ms. Sloan received at the closing for the net amount due the seller was $1,315,573.32. There is no evidence that Ms. Sloan pocketed an extra $3 million.
The final judgment entered by the trial court did not contain detailed findings of fact. But at the conclusion of the final *43 hearing, the trial court announced that it would assess the $3 million requested by the plaintiffs against Ms. Sloan because “the doc [sic] stamps are an official record pursuant to statute.” The trial court explained that Ms. Sloan had failed to rebut the presumption that the consideration reflected by the documentary stamps was the price at which the property was sold.

B. The Standard of Review

In examining a trial court’s rulings in an action against a trustee for breach of fiduciary duty, “[w]e ... review the trial court’s conclusions of law de novo, and its findings of fact (including any findings its ruling necessarily implies) to determine whether they are supported by competent, substantial evidence.” First Union Nat’l Bank v. Turney, 824 So.2d 172, 185 (Fla. 1st DCA 2001).

C. The Use of Documentary Stamps to Prove the Sales Price

In their appellate brief, the Appellees argue: “[Sloan] testified that she sold the Keysville Property for $1.5 million.... However, it is clear from the documentary stamps ... that the purchaser of the Keysville Property paid $4.5 million for the property.” The Appellees rely, in part, on Kelly v. Threlkeld, 193 So.2d 7 (Fla. 4th DCA 1966), for the proposition that documentary stamps are prima facie evidence of the consideration paid. However, Kelly is distinguishable on its facts from this case. In Kelly, the only significance of the documentary stamps was to prove that valuable consideration had indeed been paid. Id. at 10. Unlike this case, in Kelly the actual amount of the consideration was irrelevant to the issue to be decided. Id. at 9 (“[A]ny valuable consideration, no matter how small ... is sufficient.”).
Kelly is also distinguishable from this case because the defendants in Kelly offered no evidence to rebut the grantee’s proof. Here, the contract between the Trust and Greentree and the appraisal for $625,000 only three months before the sale,[5] combined with Ms. Sloan’s additional testimony that she had received a settlement statement reflecting a sales price of $1.5 million and had never received a settlement statement reflecting a sales price of $4.5 million, sufficiently rebutted the claim that the Trust sold the property to Greentree for any amount other than that shown on the contract.
The Appellees do not directly assert that Ms. Sloan actually received from Greentree more than $1.5 million for the sale of the Keysville Road Grove. Instead, they argue that despite Ms. Sloan’s testimony that she sold the property for $1.5 million, “it is clear from the documentary stamps ... that the purchaser of the Keysville Property paid $4.5 million for the property.” The implication of this argument is that Ms. Sloan lied about the sales price of the property. But the assumption hidden in this dubious logical construction is that the purchaser to whom Ms. Sloan claimed she sold the property for $1.5 million is the same purchaser who allegedly paid $4.5 million for the property. In fact, there was not a single purchaser— *44 there were two. In the first transaction, Ms. Sloan sold the property to Greentree for $1.5 million. In the second transaction, Greentree conveyed the property to Tai-pan for $4.5 million. There was no evidence that Ms. Sloan was aware that Greentree had flipped the property to Tai-pan. Nor was there any evidence that Ms. Sloan had ever seen the documentary stamps affixed to the deed. The stamps were affixed to the deed twelve days after the closing, and the Appellees presented no evidence that Ms. Sloan ever saw the deed after the closing. Finally, Ms. Sloan’s testimony that she received a settlement statement reflecting a sales price of $1.5 million and that she never saw a settlement statement reflecting a sales price of $4.5 million was unrefuted.
We conclude that to the extent that the document stamps created any presumption about the sales price, this presumption vanished when countered by Ms. Sloan’s testimony and the entry into evidence of the contract. Absent any evidence to refute the contract and Ms. Sloan’s testimony, the Appellees failed to prove that Ms. Sloan conveyed the Keysville Road Grove for more than $1.5 million.

D. The Use of Documentary Stamps to Prove Value

Alternatively, the Appellees argue that documentary stamps on the deed reflecting consideration paid in the amount of $4.5 million proved that the property was actually worth $4.5 million. Their argument is easily summarized: Although Ms. Sloan may have received only $1.5 million for the sale of the Keysville Road Grove, she was liable for the purported $3 million loss because the documentary stamps on the deed prove the property was worth that much more than the actual sales price.
The Appellees argue that Southern Bell Telephone & Telegraph Co. v. County of Dade, 275 So.2d 4 (Fla.1973), supports their argument. We disagree. Southern Bell involved the validity of a statistical approach to compare sales prices of real estate to the value placed on those properties by the tax assessor. It is axiomatic that the size of the sample determines the value of such a statistical analysis — the greater the number of samples, the more reliable the result. It was based on such a statistical analysis that the supreme court concluded not that documentary stamps prove value by themselves but that, “taken as a whole, sales prices are acceptable indicators of value.” Id. at 9 (emphasis added). The documentary stamps were only a useful tool in establishing what those sales prices had been for statistical purposes using a large sample. Id. In this case, the sample is limited to one transaction. Thus the reference to the amount of the documentary stamps on the deed does not constitute a statistically valid method of establishing the value of the property sold.
Moreover, in this case, the appraised value of the property was less than the price Ms. Sloan ultimately obtained for the property. Ms. Sloan’s appraisal, prepared by a professional appraiser, used standard methodology, including the examination of comparable properties in the same geographical area. The amount of the sales price was consistent with Ms. Sloan’s experience and the amount that Ms. Bell had agreed to accept for the sale of the property. The Appellees offered no appraisals or other evidence about the value of the property. Instead, they relied on nothing other than the unexplained documentary stamps to support their allegation that the fair market value of the property was more than $1.5 million. Also, the Appel-lees offered no reasonable explanation for why a property that Ms. Bell had agreed to sell for $1,225,000 in 2005 — at a time *45 near the peak of Florida’s most recent real estate bubble — had increased in value to $4.5 million in 2007.

E. The Insufficiency of the Evidence to Prove a Breach of Fiduciary Duty

The Appellees failed to prove either that Ms. Sloan sold the Keysville Road Grove for more than $1.5 million or that the property was worth more than that figure. Here, the only evidence presented by the Appellees in support of their claim that Ms. Sloan had breached her fiduciary duty in connection with the sale of the Keysville Road Grove was the inconclusive evidence of the documentary stamps on the deed. In addition, Ms. Sloan presented evidence concerning the sale that conclusively refuted the Appellees’ claims based on the evidence of the documentary stamps.[6] Accordingly, the trial court erred in concluding that Ms. Sloan breached her fiduciary duty, causing damage to the beneficiaries of the Trust, and erred in imposing a $S million surcharge against Ms. Sloan.
We have considered and rejected the Appellees’ argument that Ms. Sloan violated the terms of her agreement with Ms. Bell by selling the property without providing Ms. Bell with prior notice. The sales price of the property was substantially more than the listing price that Ms. Bell had previously approved. In addition, Ms. Bell did not establish any damages resulting from the failure to provide her with notice of the sale.
Y. THE DENIAL OF ALL TRUSTEE’S FEES
On December 31, 2007, Ms. Sloan paid herself $527,425.37, for her services as trustee. Before the final hearing, the trial court ordered her to surrender this entire amount to the court. Ms. Sloan was unable to return the entire amount because she had already paid a substantial portion of it as income taxes. She deposited the remainder, $384,421.82, into the court’s registry, and then filed a petition for an order authorizing the payment of her trustee’s fees. In Ms. Sloan’s petition, she sought compensation in the amount of $628,964.97. Later, Ms. Sloan filed a supplemental petition claiming that she was due an additional $8041.57.
At trial, Ms. Sloan testified that she had calculated the amount due her as trustee based on her attorney’s advice. The Ap-pellees presented the testimony of an expert witness, Dirk Tolle, who reviewed the compensation paid by the Trust to Ms. Sloan. Mr. Tolle testified that reasonable compensation for a corporate trustee for the period under review would have been about $40,000. However, he also testified that a typical corporate trustee would not have performed a number of the tasks actually performed by Ms. Sloan. Instead, the typical corporate trustee would have hired outside specialists to perform those tasks and would have billed the fees for their services separately.
A trustee may forfeit the right to compensation if the trustee has committed a breach of the trust or otherwise willfully engaged in bad faith or misconduct with respect to the management of the trust. Traub v. Traub, 135 So.2d 243, 244 (Fla. 2d DCA 1961); 76 Am. Jur. 2d Trusts § 590 (2010). Based on the record before *46 us, we conclude that there was no evidence of bad faith, mismanagement, or breach of the Trust for which Ms. Sloan should be denied all compensation for her services as trustee. On this appeal, Ms. Sloan has only sought the $40,000 amount that the Appellees’ expert witness testified would be a reasonable fee. Accordingly, we disapprove the trial court’s disallowance of the entire amount of $527,425.37 fees paid and remand for the allowance of a trustee’s fee in the amount of $40,000. This adjustment will reduce the amount of the fees that must be repaid to the Trust to $487,425.37. Of course, Ms. Sloan is entitled to a credit against this amount for the funds she has already paid into the court’s registry.
VI. THE ADDITIONAL SURCHARGE FOR CERTAIN ATTORNEY’S FEES AND MISCELLANEOUS CHARGES PAID BY THE TRUST
The total surcharge amount of $3,610,466.81 was comprised of three separate elements. The funds allegedly “lost” on the sale of the Keysville Road Grove were $3 million. The surcharge imposed for trustee’s fees accounted for an additional $527,425.37. In its order, the trial court identified the remaining $83,041.44 only as monies “improperly paid to [Ms. Sloan] or her personal attorneys.” Based on our review of the record, it appears that $70,904.54 of the $83,041.44 consisted of disputed payments to attorneys. The remainder, $12,136.90, was paid to Ms. Sloan for her expenses for the management of the Trust assets.
A trustee has the burden of proving the necessity of all expenses incurred by him or her, including attorneys’ fees:
When a trustee seeks to charge a trust corpus with an expense incurred by him, including attorney fees, the burden of proof is upon the trustee to demonstrate that the expense was reasonably necessary and that such expense was incurred for the benefit of the trust, and not for his own benefit nor the benefit of others.
Barnett v. Barnett, 340 So.2d 548, 550 (Fla. 1st DCA 1976); see also Traub, 135 So.2d at 244 (“If the trustee fails to keep clear, distinct, and accurate accounts, all presumptions are against him and all obscurities and doubts are to be taken adversely to him. If he loses his accounts, he must bear any resulting damage.... The burden of proof is upon him to show that the money expended was a proper disbursement.” (quoting Benbow v. Benbow, 117 Fla. 37, 157 So. 512, 519 (1934))).
In this case, many of the documents in the record concerning the attorney’s fees and expenses paid by Ms. Sloan are irrelevant to the issues presented at trial. The relevant documents are generally unhelpful. For example, the trustee’s accounting statements for the years in question list payments to the Trust’s attorneys but do not explain the nature of the services for which the payments were made. The testimony at trial was similarly uninformative. When asked about the sum of $26,763.92 paid to her trust attorney in 2006, Ms. Sloan testified that it was for “trust stuff.” But when asked whether the fees paid in 2006 to two different attorneys were “at least partly for” the services her attorneys provided in a lawsuit for trustee’s fees, she answered “yes.”[7] Unfortunately, Ms. Sloan never established how much of the attorney’s fees paid during the relevant period was necessary and beneficial to the Trust. As Ms. Sloan conceded in her appellate brief, “there is no *47 break down of how the fees were allocated in the record and it is impossible to know how much of those fees, if any, were improperly expended by the Trust.”
Although our review of this record suggests that a substantial portion of the disputed fees probably was properly expended on matters beneficial to the Trust, we cannot determine the amount for which Ms. Sloan should receive credit. Here, the Appellees challenged the total payments made in the amount of $83,041.44, and Ms. Sloan simply failed to carry her burden of proving that the disputed attorney’s fees and other monies paid to her were reasonably necessary and beneficial to the Trust. Accordingly, we must approve the trial court’s surcharge of $83,041.44.
VII. CONCLUSION
We reverse the final judgment in favor of the Appellees for $3,226,044.99. On remand, the trial court shall enter an amended final judgment requiring Roger Ort-mann, as personal representative of the Estate of Marlene L. Sloan, deceased, to pay the successor trustee of the Donald E. Hemphill Trust the amount of $186,044.99 ($570,466.81 less the $384,421.82 previously paid into the court registry).
Reversed and remanded with directions.
ALTENBERND and KHOUZAM, JJ., Concur.

. The actual amount awarded was $3,610,466.81. The lesser amount in the written judgment reflects a deduction of $384,421.82, which Ms. Sloan had already paid into the court registry.

. Ms. Sloan died while this appeal was pending. We substituted Roger S. Ortmann, as personal representative of the Estate of Marlene L. Sloan, deceased, as the Appellant in this case.

. The seller’s closing statement reflects that the net amount paid to Ms. Sloan as trustee was $1,315,573.32.

. Despite the attempt of the attorney for the plaintiffs to impeach Ms. Sloan on this point by noting that she had signed the warranty deed, the evidence supports Ms. Sloan's testimony. She signed the deed at the closing, on February 14, 2007, but the documentary stamps were not affixed to the deed until it was recorded on February 26, 2007, twelve days later. The Appellees did not present any evidence that Ms. Sloan ever saw the deed after the February 14 closing. Moreover, even if Ms. Sloan had seen the deed after closing, there was no evidence that she was generally knowledgeable about the correlation between the sales price of real estate and the amount of documentary stamps required to be affixed to instruments of conveyance. See §§ 201.01, .02, Fla. Stat. (2006).

. The contract between the Trust and Green-tree was introduced into evidence at the final hearing, but other significant documents pertaining to the sale were not offered in evidence. The appraisal, which Ms. Sloan used during her testimony and which counsel for both parties and the trial court discussed, was not entered into evidence. In addition, the closing statement and the form 1099S prepared by the closing agent were not introduced into evidence at the final hearing. Although these omissions do not affect our conclusions, the entry of these items into evidence would have assisted the trial court. We note that Ms. Sloan’s appellate counsel did not represent her at the final hearing.

. In her motion for rehearing, Ms. Sloan proposed to offer additional evidence regarding the subsequent sale of the Keysville Road Grove from Greentree to Taipan. The proposed additional evidence provided a compelling explanation for the amount of the documentary stamps on the deed. However, based on our disposition of this case, we need not discuss this additional evidence.

. The lawsuit was dismissed.